## McINTIRE v. PRYOR.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF CO-
LUMBIA.

No. 109.   Argued January 4, 5, 1899. — Decided February 20, 1899.

The facts in this case, as detailed in the statement of the case and the opin-
ion of the court, show that a gross fraud was committed by the plaintiffs
in error against the defendants, to dispossess them of the property in
question; and in view of the peculiar circumstances of the case, the
fraud, so glaring, the original and persistent intention of McIntire
through so many years to make himself the owner of the property, the
utter disregard shown of the rights of the plaintiff as well as of the
mortgagee, the false personation of Emma Taylor, and the fact that
the decree can do no harm to any innocent person, this court holds that
these facts do away with the defence of laches, and demand of the court
an affirmance of the action of the Court of Appeals of the District of
Columbia, granting the relief prayed for by the plaintiffs below.

THIS was a bill in equity filed in the Supreme Court of the
District of Columbia by Mary C. Pryor against Edwin A.
McIntire, Martha McIntire and Hartwell Jenison to obtain
the nullification and avoidance, upon the ground of fraud, of
a certain foreclosure of real estate in the city of Washington.

The facts were in substance that, in May, 1880, the plain-
tiff Mary C. Pryor, being the owner of parts of lots twenty-
one and twenty-two in square numbered 569, conveyed the
same by trust deed to Edwin A. McIntire to secure the
defendant Hartwell Jenison in the sum of $450 for money
advanced by Jenison, which was represented by a note made
by the complainant and her husband Thomas Pryor, since
deceased, payable one year after date, with interest at the
rate of eight per cent, payable quarterly.

Default having been made in payment of the note, the
property was regularly advertised for sale under the deed of
trust, and, after a week's postponement on account of the
weather, was sold on June 17, 1881, and bought in nominally
by Jenison for $806, the difference between $450, the amount
of the Jenison loan, and $806, the amount for which the prop-

erty was sold, being the taxes which had accrued on the property, together with the expenses and commissions attending the sale, which amounted all told to $839.19. In this connection the plaintiff averred that the defendant McIntire had represented to her husband, Thomas Pryor, that the sale would be only a matter of form, and that he, Pryor, could buy in the property, and that time would be given him to pay the indebtedness; that the sale was made without the knowledge of Jenison, the holder of the note secured by the deed of trust; that, as had been previously agreed, Pryor, the husband of the plaintiff, did in fact become the purchaser at the trustees' sale for the sum of $700, and the property was struck off to him; that they were not disturbed in the possession of the property for some time, when McIntire called on them and told them that they might pay rent to him, and that it would be applied to the payment of the principal of the debt, and that accordingly they paid rent until September, 1884, at the rate of six dollars per month, with the understanding that this would be applied to the liquidation of the note, and that when the same was paid the property would be reconveyed to the plaintiff. On June 29, 1881, a few days after the sale, a deed was executed to Jenison, for the nominal consideration of $806, and on the same day Jenison gave a new note to one Emma Taylor for the sum of $425, and secured the same by a deed of trust on the same property, the note being payable one year after date with eight per cent interest. Subsequently, and on April 21, 1882, Jenison conveyed the property outright to Emma Taylor on receiving the $425 note.

Subsequently, and in May, 1884, Emma Taylor conveyed the property to Martha McIntire, the sister of the defendant Edwin A. McIntire. By reason of some supposed defect in the deed from Jenison to Taylor, Jenison subsequently, and on September 27, 1887, made a quitclaim deed of his interest in the property to Martha McIntire, who, in October, 1886, built four houses upon the property, two fronting on F street and two in the rear facing an alley, of which she has had the use and enjoyment ever since.

Plaintiff's averments in this connection were that the sale by McIntire under the Jenison deed of trust was made in his own interest, with the fraudulent intent of getting possession of the property; that the $425 note given by Jenison to Emma Taylor, secured by a deed of trust, was fictitious and a part of the same scheme; that Emma Taylor was a fictitious person; that the deeds to her were void; that the deed from her to Martha McIntire was also fictitious, and that the subsequent deed from Jenison to Martha McIntire of September 27, 1887, was procured by the fraudulent representations of Edwin A. McIntire.

The prayer was that the sale under the deed of trust be set aside; that an account be taken of what was due by the plaintiff upon the note for $450, and upon the payment of the same that the plaintiff be declared the owner of the property, and that the trustees be required to account to her for rents, issues and profits received by them on account of such property since the foreclosure sale.

The answer of Edwin A. McIntire denied all allegations of fraud and deceit; averred that the sale was *bona fide* in all respects; that he had no interest whatever in the property, and that it belonged to his sister Martha McIntire, who bought it in the regular course of business, and who, in her answer, denied that she participated in or had anything to do with any fraudulent scheme to get possession of the property, or that she had knowledge of any fraud on the part of her brother, and alleged that she was a true and *bona fide* purchaser of the property in dispute.

Jenison also answered the bill, stating that he had directed the sale to be made and the property bought in for him, if necessary for his protection; that he made the deed to Emma Taylor, as well as the quitclaim deed to Martha McIntire, and that he knew nothing whatever of any fraud on the part of Edwin A. McIntire.

Upon a hearing upon pleadings and proofs, the Supreme Court rendered a decree dismissing the bill upon the ground of laches. Plaintiff appealed to the Court of Appeals, which reversed the decree of the court below; remanded the case to

the Supreme Court of the District of Columbia, with instructions to take an account of the indebtedness due by the plaintiff to Jenison, together with an account of the rents and profits collected by the defendants, and directed that upon the coming in of such report a final decree be passed annulling each and all of the several trust deeds that clouded the title to said premises, and awarding possession thereof to plaintiff upon her paying the amount due Jenison, and to the defendant Martha McIntire, upon the statement of the account. 7 D. C. App. 417.

In compliance with these instructions the Supreme Court subsequently entered a final decree in favor of the plaintiff for $1664.93, and set aside the deed of trust from plaintiff and her husband to Edwin A. McIntire, and all the subsequent deeds, six in number, which operated as a cloud upon plaintiff's title.

Another appeal was taken from this decree to the Court of Appeals, which affirmed the decree of the Supreme Court, 10 D. C. App. 432, whereupon Edwin A. McIntire and Martha McIntire took an appeal to this court.

Shortly after the commencement of this suit, four other suits were begun by Elizabeth Brown, Annie Ackerman, John Southey et al. and Joseph Hayne and wife, for similar purposes as the above, to procure the annulment of certain deeds of real estate to and from Emma Taylor, based upon her supposed fictitious character. The details of the fraud set forth in these bills were different, but in all of them the fictitious character of Emma Taylor was charged, and in all of them, but one, Martha McIntire purported to have become the owner of the property. For the purpose of saving the expense of repeating testimony, it was stipulated that the testimony in each of the cases, so far as relevant, might be read and considered by the court as having been taken in each of the other cases. The Court of Appeals entered a decree in each of these cases, except one which was dismissed on the ground of laches, granting the relief prayed. The amount involved in the other cases, except the *Pryor case,* was insufficient to give this court jurisdiction; but upon the appeal to this court the

testimony in each of the other cases was brought up under the stipulation in the *Pryor case.*

*Mr. Frank T. Browning* for appellants. *Mr. Enoch Totten* and *Mr. William H. Dennis* were on his brief.

*Mr. Franklin H. Mackey* for appellee.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

Two questions are presented by the record in this case: First, that of fraud in the sale and subsequent manipulation of the property in suit; and, second, that of laches in instituting these proceedings.

1. The question of fraud necessarily involves the examination of a large amount of testimony, and a scrutiny of the successive steps taken, which finally resulted in the transfer of the property from its original owner, Mary Pryor, to its present owner of record, Martha McIntire.

The bill avers and the answer admits the execution of a deed of trust May 2, 1880, by the plaintiff and her husband to Edwin A. McIntire as trustee, to secure a note for $450, payable to Hartwell Jenison one year after date, with interest at eight per cent. The transaction originated four years previously, (May 2, 1876,) when the plaintiff and her husband placed upon the same property a deed of trust, in which Brainard H. Warner and Henry McIntire were named as trustees, to secure a note of $500, payable to George E. Emmons two years after date, with interest at ten per cent. This loan had been made through the agency of B. H. Warner & Co., real estate agents, and the note appears to have been purchased as an investment by Jenison, who was then a clerk in the Treasury Department. Upon the maturity of this note, May 2, 1878, twenty-five dollars were paid by way of interest, and fifty dollars on account of the principal, but nothing was done until 1880, when the deed of trust for $450 was given. Jenison appears to have purchased the first note

at the suggestion of Henry McIntire, a brother of Edwin A., who was also a clerk in the Treasury Department. Jenison states that Edwin A. collected what was paid upon the note and attended to the second deed of trust himself, in which his name was substituted as trustee in the place of the trustees named in the first deed. Jenison appears never to have seen the Pryors, nor their property, having entire confidence in McIntire's integrity. The property seems to have been worth at that time from $1800 to $2400, and was occupied by the plaintiff's husband as a wood and coal yard. Both the Pryors were uneducated colored people, Pryor making his living by whitewashing, sawing wood, and selling coal, and his wife by taking in washing. The husband died about three months before this suit was begun.

The note fell due May 2, 1881. Neither principal nor interest was paid, and upon the following day, May 3, a warranty deed appears to have been executed by plaintiff and her husband to Martha McIntire, a sister of the principal defendant, for the nominal consideration of five dollars. It does not clearly appear why this deed was executed, as it was never recorded. Upon its face it is an ordinary warranty deed, and although the Christian name of the grantee, Martha, is obviously written over an erasure, attention is called to this fact in the testamentary clause. The grantors' signatures are probably genuine, although the deed appears to have been procured of the plaintiff in total ignorance of its contents or purport. Indeed, she had never seen Martha McIntire and knew absolutely nothing about her. Edwin A. McIntire's explanation is that Pryor came to him; said that he could not pay the note, and asked him whether he could get a purchaser of the property who would take it off his hands and assume the incumbrance and taxes, which he represented to be twenty or thirty dollars; that he offered it to his sister as an investment; had the deed made to her for a nominal consideration, with the understanding that she would assume the incumbrance and give Pryor a lease on the property for a year. He afterwards ascertained that the taxes were ten times the amount he had supposed, and reported the

fact to his sister, who thereupon declined to take the property, which accordingly went to a foreclosure. In explanation of the erasure he said the deed was first made to his uncle David McIntire, who was looking out for bargains in real estate, and then altered to Martha McIntire and noted on the deed itself.

It seems somewhat singular that neither of these parties should have been willing to give five dollars for a piece of property worth at least $1800, and subject only to the lien of a mortgage of about $475, and $250 of special taxes; and equally singular that the Pryors should have been willing to dispose of their equity in the property for so small a sum. Indeed, it is difficult to believe that they knew what they were doing when they signed the deed.

But as nothing has ever been claimed by virtue of this deed, it is practically out of the case, except so far as it tends strongly to show an original design on the part of Edwin A. McIntire, who had entire charge of the transaction and witnessed the deed, to vest the title to the property in some member of his family, whom the other evidence in the case shows him to have used as a mere catspaw for himself.

Failing to induce his sister to take the property, McIntire, as trustee, obtained written authority from Jenison to sell upon foreclosure of the deed of trust, advertised the property for sale upon June 10, and after a postponement sold the same on June 17, but to whom the property was struck off, and who was the real purchaser, is somewhat uncertain. There is a wide divergence in the testimony on this point. Plaintiff swears that the first intimation she had of the sale was the display of the auctioneer's flag in front of the property, which was then occupied as a coal yard. Not understanding what it meant, her husband went to see McIntire, who came down that day, and "said that the trustee was pushing him, and he was compelled to put the flag up and have a sale, but that he would allow my husband to bid it in and would knock it down to him." Three or four witnesses, who were present at the sale, swore that the property was struck off to Pryor. Plaintiff swore to the same effect, but she was so far from where the auctioneer stood that it was very doubtful whether she

could have heard it. She also swore to an agreement that she was to pay a rent of six dollars a month for the property, which was to be applied on the purchase money. Certain it is that rent was paid for the property after the sale and until some time in 1883, sixteen receipts for which, signed by McIntire, are produced. This testimony with regard to the sale and the arrangement for payment is wholly denied by McIntire, who produces a bill for auctioneer's services, showing the sale of the property to Jenison, to whom on June 29, 1881, McIntire executed a deed of the property in alleged pursuance of the foreclosure sale, upon an expressed consideration of $806, but kept the same from record unknown to Jenison for a period of nearly ten months, and until April 21, 1882, when he caused the same to be recorded. Did the case stand upon this testimony alone we should entertain grave doubts whether the oral evidence was sufficiently definite and credible to overcome the testimony of McIntire, the documentary evidence of the receipts for rent and the deed to Jenison in pursuance of the sale; but all doubts in this particular are fully resolved by the subsequent conduct of McIntire with reference to the property.

It seems that Jenison, being unable or unwilling to pay the expenses of foreclosure, which amounted to $87.88 and accumulated taxes to the amount of $278.81, for the purpose of raising money to pay these, executed a note to one Emma Taylor for $425, payable in one year, and secured the same by a deed of trust upon the property to the defendant McIntire as sole trustee. This deed was also executed on June 29, 1881, and was of even date with the deed executed by McIntire to Jenison in pursuance of the foreclosure.

The testimony in this case turns largely upon the existence and identity of Emma Taylor. It is charged in the bill that she is a fictitious person, and that a sister of McIntire's, whose name was Emma T. McIntire, was represented and held out by him as Emma Taylor. Certainly, so far as witnesses have sworn to having seen Emma Taylor, they might easily have been led into supposing that his sister was this person. All that we know definitely of Emma Taylor is that from April 1,

1881, to September 6, 1884, her name appears as grantor or grantee in seventeen different deeds, having an aggregate consideration of some $13,000. Copies of nine of these deeds appear in the record, in all but one of which she is described as of the city of Philadelphia, although all of these deeds, both to and from herself, were executed in Washington and acknowledged before the same magistrate. No letters written by her are produced, and but one addressed to her. This bears date September 19, 1887, and was written by McIntire, asking for her address. The letter seems to have been addressed simply to "Pittsburg, Penn.," on some information of her being there, and to have been returned to the writer. This letter was probably a subterfuge. The transactions in which she appears as a party all seem to have been carried on through McIntire as agent, who collected rents and other moneys, paid taxes and made repairs on her account. She seems then to have disappeared as suddenly as she originally appeared, and McIntire professes himself entirely unable to find her, or learn of her present whereabouts. This is certainly a feeble and suspicious explanation. In view of the number and magnitude of the transfers to which she was a party, we should have reason to expect that her existence could be established beyond the shadow of a doubt. If she were a resident of Philadelphia, as now claimed, McIntire could hardly have failed to have had correspondence with her; to have known her address and to have been able to find dozens of her friends, relatives or neighbors, who could have proved that she was a living person. If she were a resident of Washington during these years, where did she live? In what bank did she keep the money she invested in real estate? Who were her acquaintances and why did she vanish so suddenly after these large transactions? She could scarcely have failed to leave a correspondent here, and that correspondent could scarcely have failed to be McIntire himself. It is incredible that a woman so well off and so alert in matters of business should have disappeared at the moment when her presence was indispensable and left no trace behind her.

What have we in lieu of what we might naturally have ex-

pected? A few witnesses who swear they saw her once and saw her under circumstances which indicated that they had seen a woman who passed under that name, and who might have been a wholly different person — one, who took a deed from her, and after testifying that he had never seen her, on being recalled said that he "somehow had the impression" that upon one occasion she had been pointed out by McIntire's clerk in his office as Emma Taylor. The clerk himself, who was in McIntire's employ five years, has no recollection of ever meeting her, but had heard her name mentioned, and thinks he must have seen her from the fact that he witnessed a deed purporting to have been signed by her. Another, who kept an ice cream parlor on G street from 1876 to 1879, saw her once or twice in McIntire's office, and heard her called Emma Taylor by a lady who used to come to his parlor with her. Another, who used to visit McIntire's office every day in 1879, saw a lady frequently come there, whom he was informed was Emma Taylor, and that she talked about buying real estate. It appears, however, that there was no deed to her prior to April 1, 1881. Another, who had her studio on F street, used to take her meals at the same dining room, heard her spoken of as Miss Taylor, but never spoke to her herself, and did not know whether her name was Emma Taylor or not. Another, named Atkinson, who was with McIntire until the latter part of 1880, testified that he saw a woman a number of times in the office whose name he understood was Emma Taylor, and that she was a different person from Emma T. McIntire. Another testified that he had met her at the office of the magistrate before whom she made her acknowledgments.

In addition to this most indefinite testimony, we have only the testimony of Edwin A. McIntire, Martha McIntire and Emma T. McIntire, two of whom are parties to this suit and strongly interested in the result. Emma T. McIntire testifies that she was never called Emma Taylor, and that her middle name was not Taylor, and that she never executed any of the deeds purporting to have been signed by Emma Taylor. Neither she nor her sister seems to have met her more than

three or four times.    It further appears that all the deeds
to Emma Taylor, even from McIntire himself, carried to the
recorder's office for record, were returned to McIntire, though
this was denied by him, and that rents due to Emma Taylor
were all paid to him.    It seems, too, that he paid all the taxes
upon her property, though he swears he has no recollection
of doing so.

We give but little weight to the certificate of the magis-
trate who was not sworn as a witness, that Emma Taylor
appeared before him and acknowledged the deeds to which
her name was appended as grantor, since it would have been
practically easy for McIntire to represent another person as
Emma Taylor.

The testimony of McIntire himself with regard to Emma
Taylor is extremely unsatisfactory.    Notwithstanding the num-
ber and magnitude of the transactions in which he took part
and acted as her agent, he has no explanation of the manner
in which the consideration for these deeds was paid or re-
ceived by her, the bank in which it was deposited, or from
which it was drawn, and is unable to produce a single check
or letter signed with her name.    His memory is excellent
where he cannot be contradicted and as to unimportant de-
tails, but fails him utterly as to the leading facts of the trans-
actions.    While for three years his relations with her must
have been constant and confidential, collecting and disbursing
moneys for her and looking out for real estate investments,
yet he produces no account with her, and professes to have
completely forgotten that he ever collected rent for her at
all.    One Alfred Brown who bought property from her in
May, 1883, gave $200 in cash and twelve notes of $75 each,
payable at intervals of three months, the last maturing in
May, 1886, swears that he paid every one of them as they
fell due to McIntire personally; yet McIntire swears he has
no recollection of collecting these notes, and that Emma dis-
appeared from Washington about 1884.   He tells us that she
was a woman who was constantly looking out for bargains
in real estate, yet the records show that all her transactions
were with him or through his agency, and in every case in

which she became the purchaser of lands the title ultimately became vested in his sister Martha. In this connection it is a suspicious circumstance that whenever she made a conveyance, the deed was not usually recorded for years afterwards, when the necessity for making a complete chain of title required it to be put on file. Upon the other hand, the deeds made to her as grantee were immediately placed on record. None of the parties to whom she gave or from whom she received deeds of property ever met her, nor did the clerk in McIntire's office during these years recollect that he had ever seen her.

He accounts for his inability to produce letters, receipts, accounts or written evidences of any sort, showing his transactions with her, by an utterly improbable story of a fire in his office, which seems to have conveniently consumed all these documents, including a large ledger, in which her accounts were contained, and to have spared everything else, leaving no mark of fire or even the stain of smoke upon documents showing his relation to others. He professes to have thought that Emma Taylor was engaged in one of the departments, because she came down F street after the hour the departments would close, but never asked her in what department she was employed, and the compiler of the ".Blue Book" swears that no such person was in the employ of the Government in Washington at that time. All the witnesses who testified to having seen a person of that name fixed the time as prior to the date of her first deed, April 1, 1881; and not one of them, except the McIntires, is able to identify her as *the* Emma Taylor who signed the deeds in question.

There is strong evidence tending to establish the identity of Emma Taylor and Emma T. McIntire. A niece of McIntire's swears that she always understood that the initial in the name of Emma T. McIntire stood for Taylor, and that she was always called Emma Taylor to distinguish her from witness' sister Emma V. McIntire. This witness is corroborated by the production of the family Bible, from which it appears that Emma T. McIntire's father was named Edwin Taylor McIntire. Her own explanation, that her middle initial stood

for Tinsey Ush or Tots — a pet name given her in infancy by her father — does not seem plausible in the face of this testimony. In addition to this, a large number of documents, signed both by Emma Taylor and Emma T. McIntire, were introduced in evidence for other purposes, and a comparison of the signatures shows a resemblance between some of them which is difficult to account for, except upon the theory that they were written by the same person, although the later ones signed by Emma Taylor show an evident attempt to disguise her hand.

But it is useless to pursue this subject further. The testimony of the three McIntires is too full of contradictions and absurdities to be given any weight. While under certain circumstances the other testimony for the defendant might be sufficient to prove that there was such a person as Emma Taylor, when considered with reference to what we have a right to expect in a case of this kind, it falls far short of it, and when read in connection with plaintiff's testimony upon the same point, we are left in no doubt that Emma Taylor was a clumsy fabrication. If the person put forward by McIntire to personate her were not his own sister, it was some one whom he used for that purpose. Under whatever view we take we are satisfied that Emma Taylor was a creation of McIntire's brain, born of the supposed necessities of his case, and bolstered up by the false testimony of himself and his sisters. *Stat nominis umbra.*

The subsequent proceedings in the case show a consummation of the fraud by which the property was ultimately vested in Martha McIntire. The deed of trust given by Jenison to Emma Taylor was never formally foreclosed. It seems that McIntire had promised Jenison that he would try and find a purchaser of the property before the note fell due on June 29, 1882, so that he might get back a part of the $450 loaned to Pryor, none of which he had received; but professed himself unable to do so, and so informed Jenison, a man of perfect integrity but of little experience and much unwisdom in business methods, who seems to have had entire confidence in him, and on April 13, 1882, addressed him a note, in which he

stated that he was not in a condition to carry the property; that he should doubtless have to submit to a sacrifice by a forced sale, and requested him to advertise and do the best he could in its disposition. Considering that the property was worth from $1800 to $2400, when the mortgage to Emma Taylor was only $425, the interest on which was less than $40 per year, while the Pryors were paying six dollars a month rent, it would appear that Jenison was completely hoodwinked as to its actual value.

After some futile efforts to induce McIntire to put the property up at auction, he was finally persuaded, on April 19, 1882, more than two months before the Emma Taylor note was due, to deed the property to Emma Taylor. This deed was recorded immediately and at the same time with his deed upon foreclosure to Jenison, which had been executed ten months before. Both of these deeds, after being recorded, were returned to McIntire. This was the last step necessary to consummate the fraud by which the plaintiff lost her property, and Jenison lost the money he had loaned her upon the deed of trust. Had McIntire been content to defraud the Pryors of their property, he might, after his duties as trustee had been fully discharged, have purchased of Jenison, who doubtless would have been glad to sell for the amount of his mortgage and interest; but his desire also to defraud Jenison of this amount made it necessary for him to introduce another party to purchase Jenison's interest, from whom his sister Martha (that is, himself) might pose as a *bona fide* purchaser. In this he overreached himself.

The title remained of record in Emma Taylor until May 31, 1884, when she made a warranty deed to the defendant Martha McIntire for the expressed consideration of $2500. Subsequently, and on September 27, 1887, Jenison and wife made a quitclaim deed, apparently of further assurance, to Martha McIntire, for a consideration of $100, paid by the check of Edwin A. McIntire. The answer avers this deed to have been made to cover and cure a defect in the deed from Jenison to Taylor, but on its face it purported to pass to the grantee, Martha McIntire, all claims for drawback or rebate on account

of special taxes upon the property, and it is probable that this was its main object.

We do not care to discuss the question whether Martha McIntire was a *bona fide* purchaser of this property. So far as it turns upon her ability to pay the $2500 named as a consideration, it is at least doubtful. So far as it turns upon her actual payment of this consideration, it is more than doubtful. If Emma Taylor were a fictitious person, and the deed from her a forgery, the title of Martha McIntire falls to the ground, except so far as it depends upon the quitclaim deed of Jenison to her of September 27, 1887, which it is not improbable was procured by Edwin A. McIntire for the very purpose of giving a semblance of title in case Emma Taylor were eliminated from the case. But whatever was done by Martha McIntire to this property; whatever title she acquired was through the agency of her brother, and she is as chargeable with his frauds as if she had committed them personally. *United States* v. *State Bank*, 96 U. S. 30; *Griswold* v. *Haven*, 25 N. Y. 595; *Reynolds* v. *Witte*, 13 S. C. 5. It was held by this court in the case of *The Distilled Spirits*, 11 Wall. 356, that the rule that notice of fraud to an agent is notice to the principal applies not only to knowledge acquired by the agent in the particular transaction, but to knowledge acquired by him as agent in a prior transaction for the same principal, and present to his mind at the time he is acting as such agent. Much more is this the case where the fraud is committed by the agent himself in obtaining the title to the property for the benefit of his principal. But further than this, we have little doubt that the property was really purchased for the benefit of McIntire himself. While Martha McIntire signed the contract for the construction of the house upon these lands, the testimony of the contractors shows that they supposed they were doing the work for McIntire himself; that they had no dealings with Martha; that they were paid by checks signed by McIntire himself; although she came down and looked at the houses, and seemed to be pleased with them.

We agree with the Court of Appeals that in view of their strong pecuniary interest in the case, the improbability of

many of their statements, the obvious fabrication of the Emma Taylor story, and the manifest subservience of the sisters to their brother's schemes, no confidence whatever can be placed in the testimony of either member of the family. This conviction is strengthened by a circumstance appearing in the testimony, although not directly relevant to the issue, that there was another sister, Sarah I. McIntire, who died in Philadelphia, *January 10*, 1881, leaving a deposit of $1196.60 in the Philadelphia Savings Fund Society. To obtain this money a power of attorney, bearing date *April 19*, 1881, was prepared by McIntire, purporting to be signed by Sarah I. McIntire, though she had been dead three months, and acknowledged before a notary public in Washington. It was also signed by McIntire as a subscribing witness, and by virtue of its authority Martha McIntire drew the money from the bank.

2. The question of laches only remains to be considered. The sale was made under the foreclosure of the Jenison mortgage, June 17, 1881. The bill was filed October 21, 1890, a delay of nine years and four months. Upon the theory of the plaintiff, however, — and it is upon her allegations and proofs that the question of laches must be determined, — the sale was made in her interest. The rent paid by her was to be applied by McIntire toward the extinguishment of the Jenison mortgage, and there was nothing definite to apprise her to the contrary until the fall of 1886, when she saw the contractors beginning to build, and notified them that the property belonged to her and not to McIntire. But four years elapsed from this time and the property has not been shown to have greatly increased in value, except by the improvements, which were allowed to the defendants upon final decree.

We have a right to consider in this connection that the plaintiff is an ignorant colored woman; that she has been wheedled out of her property by an audacious fraud, committed by one in whom she placed entire confidence and who assumed to act as her agent; that this agent procured the title to the property to be taken in his own interest for little more than a nominal sum by the false personation of Emma Taylor; that the property is still controlled and probably

owned by himself; that the position of the property and of the parties to the suit has not materially changed during the time the plaintiff has been in default, nor the property shown to have rapidly risen in value, and that the rights of no *bona fide* purchaser have intervened.

We have no desire to qualify in any way the long line of cases in this court, too numerous even for citation, in which we have held that where the fraud is constructive, or is proved by inconclusive testimony, or by evidence falling short of conviction, and the property has greatly increased in value, great diligence will be required in the assertion of the plaintiff's rights. But these were all cases either of bills to establish a trust, to open settled accounts, bills not involving fraud, or where the fraud was not clearly proven, or where, with knowledge of the facts, the fraud had been deliberately acquiesced in, bills to impeach judicial proceedings, or where the property had passed into the hands of persons innocent of the fraud, or with no actual notice that a fraud had been committed.

Granting all that may be fairly claimed of these cases, there is another class having a different bearing, in which it has been held that in case of actual fraud a delay, even greater than that permitted by the statute of limitations, is not fatal to the plaintiff's claim. The leading case is that of *Michoud* v. *Girod*, 4 How. 503, which was a case of actual fraud committed by trustees of real estate against their *cestui que trust*. A bill filed thirty-six years after the commission of the fraud was held not to have been too late. In that case a purchase by an executor through a third person, of property of the testator, was held to be fraudulent and void, though the sale was at public auction, judicially ordered, and the result of the evidence was that a fair price was paid. Said Mr. Justice Wayne, in delivering the opinion of the court, (page 560): "In a case of actual fraud, courts of equity give relief after a long lapse of time, much longer than has passed since the executors, in this instance, purchased their testator's estate. In general, length of time is no bar to a trust clearly established to have once existed; and where fraud is imputed and proved, length of time ought not to

exclude relief. . . . There is no rule in equity which excludes the consideration of circumstances, and, in a case of actual fraud, we believe no case can be found in the books in which a court of equity has refused to give relief within the lifetime of either of the parties upon whom the fraud is proved, or within thirty years after it has been discovered or becomes known to the party whose rights are affected by it."

So, in *Prevost* v. *Gratz*, 6 Wheat, 481, 497, it was said by Mr. Justice Story : " It is certainly true that length of time is no bar to a trust clearly established; and in a case where fraud is imputed and proved, length of time ought not, upon principles of eternal justice, to be admitted to repel relief. On the contrary, it would seem that the length of time during which the fraud has been successfully concealed and practised, is rather an aggravation of the offence and calls more loudly upon a court of equity to grant ample and decisive relief."

In *Baker* v. *Whiting*, 3 Sumn. 475, one Tidd, being the owner of certain land, employed the defendant Whiting as his agent to care for the same, pay all taxes, etc. Whiting allowed the land to be sold for taxes in 1821 and bought it in himself, keeping the plaintiff uninformed of the facts. The bill was filed in 1837 by the heirs of Tidd, who died shortly after his employment of Whiting. In delivering the opinion, Mr. Justice Story remarked : " Then it is said the plaintiffs are barred from any right in equity by the mere lapse of time. . . . But what is more particularly applicable to the present case, twenty years had not elapsed before the filing of the bill; and I apprehend that, in case of a trust of lands nothing short of the statute period, which would bar a legal estate or a right of entry, would be permitted to operate in equity as a bar of the equitable estate."

In *Allore* v. *Jewell*, 94 U. S. 506, which was a bill to cancel a conveyance of land alleged to have been obtained by the grantor a few weeks before her death, when from her condition she was incapable of understanding the nature or effect of the transaction, it was held that a lapse of six years before bringing suit to cancel the conveyance could not avail the

defendant, where he had possession of the land and a reasonable rent therefor was equal to the value of his improvements, and there had been no loss of evidence preventing a full presentation of the case.

In *Meader* v. *Norton*, 11 Wall. 442, three sisters obtained in 1839, from the governor of California, a tract of land which was approved by the departmental assembly and possession delivered. Some years after, the husband of one of the sisters, named Bolcoff, suppressed or destroyed this grant and fabricated a pretended grant to himself, and also certain other papers intended to prove the genuineness of such fabricated grant. Upon these papers the sons of Bolcoff, he having died, obtained a confirmation of their claim to the land, the land commissioners supposing that the fabricated papers were genuine; and upon such decree a patent issued to the claimants. The fabricated character of these papers being discovered, the grantee of the rights of the three sisters brought a suit in equity to have the defendants holding under the patent declared trustees of the legal title and compel a transfer of that title to him. Held: that the suit, which was begun in 1865, would lie, and that laches could not prevail as a defence where the relief sought was granted on the ground of secret fraud, and it appeared that the suit was commenced a reasonable time after the fraud was discovered.

In *Insurance Co.* v. *Eldredge*, 102 U. S. 545, 548, a deed of trust of lands to secure a promissory note was released without the surrender or payment of the note, and without express authority of the holder. It was held that a subsequent purchaser with notice took the land subject to the equitable rights of such holder. The extent of the delay does not clearly appear in the report, but in the opinion of the court it is said by Mr. Justice Field: "The company, as already stated, must be deemed to have known of the want of power in the trustee to release the property from the Coburn deed, and it does not lie in its mouth to object that the complainant did not sooner seek to set aside the priority of lien thus gained; nor can it aver that his claim to have the instrument cancelled, by which this priority was secured, is a stale one,

when asserted within the period allowed by law, and no rights of third parties as *bona fide* purchasers have intervened to render inequitable the assertion of his original lien."

In *Bowen* v. *Evans*, 2 H. L. 257, a bill filed to set aside a sale of lands made nearly fifty years before under a decree, on the ground of irregularities in the proceedings and fraud in the sale, it was held that, in the absence of proof of fraud on the part of the purchaser, or that the estate was sold under the value by reason of any corrupt bargain, the sale was not impeachable; but in delivering the opinion Lord Chancellor Cottenham observed : " So, when much time has elapsed since the transactions complained of, there having been parties who were competent to have complained, the court will not, upon doubtful or ambiguous evidence, assume a case of fraud, although upon fraud clearly established no lapse of time will protect the parties to it, or those who claim through them, against the jurisdiction of equity depriving them of the fruits of their plunder."

The case of *Hopkins* v. *Hammond*, 143 U. S. 224, a leading case in this court, is not to the contrary. In this case two partners owned real estate in common, some of which was used in the partnership business. One died making the other by his will a trustee for the testator's children, with power of sale of all the real estate, and directing that the business be continued. After carrying on the business for some time the trustee sold the real estate by auction, and bought portions of it in through a third person, and accounted for half of the net proceeds. The transaction was open and known to all the *cestuis que trustent*, and was objected to by none of them. It was held that there was nothing in this to indicate fraud; that the purchase was not absolutely void but voidable, and might be confirmed by the parties interested, either directly or by long acquiescence, or by the absence of an election to avoid the conveyance within a reasonable time after the facts came to their knowledge. There was a delay of nearly twenty years in this case. In delivering the opinion the Chief Justice said : " Each case must necessarily be governed by its own circumstances, since, though the lapse of a few years may be

sufficient to defeat the action in one case, a longer period may be held requisite in another, dependent upon the situation of the parties, the extent of their knowledge or means of information, great changes in values, the want of probable grounds for the imputation of intentional fraud, the destruction of specific testimony, the absence of any reasonable impediment or hindrance to the assertion of the alleged rights, and the like." A bare statement of these facts will show that it has no application to the case now under consideration.

So in *Felix* v. *Patrick*, 145 U. S. 317, where a bill was filed after a lapse of twenty-eight years to impeach a title fraudulently acquired through the location of certain land script, and the land was shown to have increased enormously in value by being taken within the limits of a city, and to have been largely occupied by persons who had bought on the strength of the apparent title, and erected buildings of a permanent character, it was held that the complainant was barred by laches, but in the opinion of the court it is said : "The law pronounces the transaction a fraud upon her, but it lacks the element of wickedness necessary to constitute moral turpitude. If there had been a deliberate attempt on his part by knavish practices to beguile or wheedle her out of these lands, we should have been strongly inclined to afford the plaintiffs' relief at any time during the life of either of the parties; but as the case stands at present justice requires only what the law, in the absence of the statutory limitation, would demand — the repayment of the value of the script with legal interest thereon."

In *Norris* v. *Haggin*, 136 U. S. 386, plaintiff filed his bill in 1884, alleging an actual fraud committed against him by his two attorneys in 1859, twenty-five years previously, and that he had only discovered the fraud a short time before commencing his suit. The case was heard on demurrer to the bill, and the court found that "there are many things about the bill which are peculiar and calculated to throw suspicion on the claims." It also found that the statement that the complainant had only come to a knowledge of the alleged fraud within a short time of the filing of the bill was shown by the

statements in the bill itself to be false, and that he had known of the alleged fraud for over fifteen years, and that a number of other matters alleged in the bill and amended bill were shown by other contradictory statements to be false, and thereby the whole claim was rendered suspicious; that there were ambiguities in the bill, etc. Taking the whole case as stated by the complainant himself, the court thought that the bill had properly been dismissed by the court below. It is evident that the bill was dismissed upon the ground that the fraud was doubtfully or ambiguously alleged, the claim suspicious and that knowledge of the fraud had existed for a long time.

We do not wish to be understood as holding that the plaintiff, even in the case of actual fraud, may wait an indefinite time, or always so long as the statute of limitations would permit him to bring an action at law before asserting his rights; but where the fraud is clearly proven, the court will look with much more indulgence upon any disability under which the plaintiff may labor as excusing his delay. As was said in *Townsend* v. *Vanderwerker*, 160 U. S. 171, 186 : "The question of laches does not depend, as does the statute of limitation, upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under all the circumstances of the particular case, plaintiff is chargeable with a want of due diligence in failing to institute proceedings before he did."

The circumstances of this case are so peculiar; the fraud so glaring; the original and persistent intention of McIntire through so many years to make himself the owner of the property, so manifest; the utter disregard shown of the rights of the plaintiff, as well as of Jenison, the mortgagee, upon whose ignorance in the one case and whose confidence in the other he imposed so successfully; the false personation of Emma Taylor, and the fact that the decree in favor of the plaintiff can do no possible harm to any innocent person, demand of us an affirmance of the action of the Court of Appeals. Its decree is accordingly

*Affirmed.*