WALKER, J., dissenting.
Action to recover damages for an alleged breach of a written contract for delivery of cotton.
The evidence on part of plaintiff tended to show that on 9 September, 1909, defendant entered into a written contract with plaintiff, agreeing to deliver 100 bales of cotton at Trenton, N.C. between 15 September, 1909, and November, at the price of 12 cents per pound, and plaintiff agreed to accept same and pay the stipulated price. The defendant had failed to deliver said cotton or any part thereof, to plaintiff's damage $1,000. That the contract was negotiated, on part of plaintiff, by one F. Brock, their agent, and signed by plaintiffs, per F. Brock, agent, and by defendant. That plaintiffs were large dealers and exporters (390) of cotton, supplying other dealers and mills in Europe, etc., and, through their agents, bought spot cotton, required for their business, in different sections of the country to the average amount of 400,000 bales annually. That plaintiffs intended, in good faith, to carry out the terms of the contract, and that no agent had authority from them to make purchases and contracts therefore with any other understanding.
Defendant, having filed a verified answer, alleging that the contract in question was a gaming contract prohibited by the statute, offered evidence tending to show that it was the understanding between defendant and plaintiff's agent, when contract was entered into, and that, on failure to comply, the demand could be satisfied by paying the difference, etc.
The court charged the jury. There was verdict in plaintiff's favor for $1,000 damages. Judgment on the verdict, and defendant excepted and appealed.
After stating the case: We have held, in Rodgers v. Bell, ante, 378, in reference to our statute as to gaming contracts, Revisal, 1905, ch. 36, that the words now appearing at the end of section 1689, to wit: "This section shall not be construed so as to apply to any person, firm, corporation, or his or their agent, engaged in the business of manufacturing or wholesale merchandising, in the purchase or sale of the necessary commodities required in the ordinary course of their business," by correct construction, should appear and only affect section 1691 of said chapter — the section relating to the burden of proof — and that, by reason of this clause, so placed, a bona fide wholesale dealer in spot cotton, who purchased the same in the ordinary course of his business, is not affected by said section, but is entitled to have his cause tried and determined under the rule, which generally obtains, that one who asserts that an "ordinary business contract, valid on its face, is unlawful, is required to prove it by the greater weight of the evidence." (391)
On the facts in evidence it appears that plaintiffs and their predecessors, under the style of Alex. Sprunt Sons, from 1866, have been engaged in the cotton business, and since 1880 they have exported cotton in large quantities, supplying mills and dealers abroad, and, in the ordinary course of their business, they buy annually on an average of 400,000 bales of cotton. They are, therefore, if the evidence is accepted by the jury, well within the clause withdrawing their case from the provision of section 1691, and, on another trial, the same will be submitted under the ordinary rules of evidence obtaining in such cases.
Objections were chiefly made to the validity of the trial for alleged error in a portion of his Honor's charge, as follows: "So, therefore, if you find as a fact that Alexander Sprunt Sons were engaged in the wholesale cotton business here, buying cotton and shipping it to Europe, and that they had not been engaged and were not engaged in gambling contracts or futures with the expectation of taking margins or the difference between the contract price and the price at the time of the delivery, and that they did not authorize Brock to make any such contracts, but simply authorized him to make a contract for the actual delivery of the cotton, then you will find the first issue `Yes.'"
As we understand it, the charge could only mean, and was intended, by his Honor, to mean that if plaintiffs were bona fide wholesale dealers in cotton, and only authorized Brock to make a contract for actual delivery, plaintiffs could recover for breach of a contract made by Brock, although in the negotiations and making of the contract there was an understanding between Brock and the other party that actual delivery was not intended and would not be required — a position that cannot be sustained. *Page 316 
If plaintiffs were seeking to avoid this contract and its effect, they might, under certain conditions and circumstances, be heard to repudiate the representations and conduct of their agent, Brock, who (392) acted for them in this matter. But the plaintiff here adopts the contract and is seeking recovery on it, and where this is true, he must be held bound by the acts and statements of his agent in negotiating and closing the trade. The position indicated has been often upheld in decisions of our Court and elsewhere. Beeson v. Smith, 149 N.C. 145;Corbett v. Clute, 137 N.C. 551; Black v. Baylees, 86 N.C. 527;Harris v. Delamar, 38 N.C. 219; McIntire v. Pryor, 173 U.S. 38;Manufacturing Co. v. Cotton Long, 126 Ky. 750; Haguerin v. Basely, 14 Vet., 273.
In Corbett v. Clute, supra, plaintiff sued to foreclose a mortgage; there was allegation, with evidence, on part of defendant, tending to show that the agent of plaintiff had wrongfully procured the note and mortgage by falsely representing that the son of the mortgagor, an old, feeble, inexperienced woman, had been guilty of a criminal offense, and that unless mortgage was executed her son would be prosecuted and sent to the penitentiary. It was claimed by plaintiffs and this was very well established, that they had not authorized the conduct of their agent; but the position was not allowed to affect the question, the Court saying: "It will not be contended that the plaintiff is not bound by the statements of his agent. He is here, now, asserting his claims under the note and mortgage obtained for him by this transaction, and if he claims the benefits, he must accept the responsibility," citing Black v. Baylees andHarris v. Delamar, supra, In Mfg. Co. v. Cotton, supra, it was held "that when a principal accepts an order for goods, obtained by agent, he is bound by the agent's acts in obtaining it, although he violated the principal's instructions." The principle is very generally recognized, and further citation of authority is not required.
Nor can it be contended, for a moment, that there was no testimony tending to show an understanding and agreement between defendant and plaintiff's agent, Brock, forbidden by the statute. Revisal, sec. 1689. Speaking to this question, the defendant testified as follows:
"Mr. Brock asked me if I wanted to sell some cotton for 12 (393) cents, and I told him there was already more cotton sold around there than could be delivered, even if cotton went down below the contract price. He says, `We are already in the hole; we have already sold some for 10 and 11.'"
Q. Who had? A. He and I, too, and several others. He says, "If you can sell this for 12 cents, you can take this and pay the difference in that 10-cent cotton." *Page 317 
Q. What was the agreement between you and him in reference to the actual delivery of the cotton. A. He told me it would not be expected, and we could settle on the difference.
Q. Did you intend to deliver any cotton under that contract? A. No, sir.
Q. Did you have any cotton to deliver? A. No, sir.
Q. Did you own any cotton? A. No, sir.
Q. Did Mr. Brock know that you were not farming? A. Yes, sir.
And the agent Brock testified:
You say you told Mr. May that the cotton was not expected to be delivered? A. Yes, sir; I told him I didn't think they would require the delivery of the cotton. I asked Mr. May did he want to sell some cotton for 12 cents; he said he had already sold some cotton, and as far as everything said in the conversation, I don't know about it — I can't remember that; we were talking over what they were intending to do about it — that they could take the difference in one and pay the difference in the other; and that was the way the contract was made.
Q. What was it Mr. May said to you before you signed the contract in reference to having sold some contract cotton? A. He said he had already sold some contract cotton, and in the general discussion of the contract cotton, and if he would sell more, he would take the difference in one way and pay the difference in the other; that's exactly what was said about it.
Q. What did you say to him at the time of the execution of this contract in reference to the delivery of the actual cotton? A. I told him I didn't think the actual delivery of the cotton was expected at all; if I was wrong in it, that was what I told him.
Applying the principle as stated, if, when this contract was (394) negotiated and made, there was an understanding between defendant and plaintiff's agent that actual delivery of the cotton should not be required, but that the difference between the contract and market price could be paid in money, such a contract is condemned by the statute and no recovery can be had thereon. For the error in the charge, the defendant is entitled to a new trial, and it is so ordered.
New trial.