Robert L. EVANS, Appellant,

v.

UNITED STATES FIDELITY AND GUARANTY COMPANY, and Robert A. Bell and Vera M. Bell, Appellees.

No. 1864.

Municipal Court of Appeals for the District of Columbia.

Argued Oct. 1, 1956.

Decided Dec. 20, 1956.

Rehearing Denied Jan. 9, 1957.

2. D.C.Mun.App., 85 A.2d 917.

David F. Smith, Washington, D. C., for appellant.

Thomas S. Jackson, Washington, D. C., with whom Louis M. Denit, Martin R. Fain, and Richard A. Bishop, Washington, D. C., were on the brief, for appellee United States Fidelity and Guaranty Co.

Dudley G. Skinker, Washington, D. C., for appellees Bell.

Before ROVER, Chief Judge, and HOOD and QUINN, Associate Judges.

QUINN, Associate Judge.

This suit was filed by United States Fidelity and Guaranty Company (hereinafter referred to as U. S. F. & G.) against appellees Bell and appellant Evans for money paid to their use. The Bells filed a cross-claim against Evans. Trial by the court resulted in a judgment against both the Bells and Evans and over against Evans on the cross-claim.

The facts necessary for a determination of this appeal are as follows: In July 1953 title to certain real property located in the District of Columbia was vested in the grandparents (hereinafter referred to as the elder Bells) of Robert A. Bell. (Robert and his wife will be referred to as the younger Bells.) The elder Bells desired to convey the property to the younger Bells contingent upon certain refinancing arrangements and other good and valuable consideration not material here, but none of the Bells knew how to effect such conveyance. Accordingly, on July 16, Robert A. Bell engaged Evans, a real-estate broker, to make the necessary arrangements, which entailed procuring a real-estate loan sufficient in amount not only to pay existing property encumbrances but also to pay for certain improvements previously made on the property.

On or about July 20, Evans procured from a bank in the District of Columbia a commitment for a $4,000 loan, to be secured by a first deed of trust upon the property. He then ordered title examination which disclosed that the property was encumbered of record by a deed of trust executed by the elder Bells in 1927. Evans represented to the title company that the note securing the deed of trust was lost and by reason of its age could be presumed to have been paid. He then arranged for the elder Bells to obtain a lost instrument bond from U. S. F. & G. The title company, upon receipt of the bond from Evans, delivered it to the surviving trustee named in the deed of trust. The surviving trustee, being obligee on the bond, executed a release of the deed of trust without requiring presentation of evidence of payment of the note. In August 1953 the net proceeds of the loan obtained by Evans were made available to the younger Bells in the form of a check for $3,672.97, which was delivered to Evans for disbursement pursuant to their written authorization. This note in fact was neither lost nor paid and thereafter the holder made demand on U. S. F. & G., as surety on the bond, and received payment in the sum of $2,423.05. Robert A. Bell testified he knew there was a note outstanding on the property, that his grandparents had been making payments on it at the Seat Pleasant Bank, and that he had so informed Evans. Evans testified that when he went to the Bells' home to see the elder Bells about executing a lost instrument bond, they brought out

> "* * * quite a bag of receipts that they wanted me to go through and they were not chronologically outlined. I told them I couldn't go into all that; if they had them, to save them; I couldn't go into all those receipts. * * * There were too many there, and old—crumpled up old receipts, * * * I didn't have the time to go through a bag of receipts covering— three or four hundred of them at that time." On direct examination he testified about the receipts as follows:

> "Well, the old gentleman [evidently referring to the grandfather] wanted me to go through all those receipts. He felt that he had paid the note off, and I said, 'Well, I just don't have time and I don't have my adding machine with me to go through all of that. You should keep up with that. I don't know where your note is.'"

Evans also testified that he had informed the younger Bells of his inability to locate the note and that he made arrangements

through them to see the grandparents about a bond covering the lost note.

Robert A. Bell testified on cross-examination that despite knowing about the note and where it was being paid, he was unfamiliar with the bond and was under the impression that everything was being taken care of by Evans. He further testified that he never saw the bond until the attorney for U. S. F. & G. showed it to him.

At the conclusion of the trial the trial judge, by adopting the first eight paragraphs of the amended complaint, made the following pertinent findings of fact: (1) The elder Bells authorized and instructed their grandson, Robert A. Bell, to make such arrangements as might be necessary to effect the transfer of title; (2) Prior to the title examination Evans was informed of the existence of a promissory note upon which the elder Bells had been making regular payments at the Seat Pleasant Bank, collecting agent for the holder of the note; (3) Both Evans and the younger Bells knew of the whereabouts of the note secured by the deed of trust or were in possession of sufficient information to enable them to find it; and (4) The elder Bells, both being aged [1] and uneducated, were unaware of the significance of the bond which they had executed. The trial judge also made oral findings which must necessarily be considered since in one instance they have the effect of qualifying an adopted finding. He orally found that Evans knew of the existence of the note but not its whereabouts. It was the trial judge's opinion, however, that the old receipts presented to Evans by the elder Bells afforded him a sufficient basis for locating the note. Thus it definitely follows that the trial judge did not adopt the finding that Evans knew of the whereabouts of the note. In the context of the findings, one is exclusive of the other. Further support for this interpretation is found in the colloquy between Evans' counsel and the trial judge at

the hearing on his motion for new trial. Evans' counsel informed the trial judge of the apparent contradiction and the latter stated that Evans should have known where the note was. Therefore, at the most the trial judge found that Evans was negligent in not locating the note. With regard to the cross-claim, the trial judge made but one finding of fact, namely, that Evans had paid $2,200 either to, or on behalf of, the younger Bells.

■ It will be noted the trial judge found that the elder Bells authorized their grandson to make arrangements for the transfer of title and pursuant to this authority, he engaged Evans. At trial there was conflicting testimony on this point, Robert A. Bell testifying first that he employed Evans and then later, that all the Bells hired Evans. On cross-examination Evans testified that the younger Bells retained him. However, his deposition statements made prior to trial were introduced to contradict this. In the deposition, when asked who employed him, he answered, "Who really employed me in the matter was the grandfather and the grandmother, because title had not passed to the [younger Bells]." Since there was conflicting testimony and Evans' credibility had been attacked, the trial judge could have made a specific finding that Evans was the agent for all the Bells. We think the evidence supports this view. Title had not yet passed to the younger Bells. Consequently, without his grandparents' permission, Robert A. Bell would have had no authority to instruct Evans; he was merely a conduit for their wishes and therefore the fiduciary relationship of principal and agent was established between both the elder and the younger Bells as principals and Evans as agent.

In an attempt to explain the disbursement of the proceeds of the loan, Evans testified that out of the $3,672.97 which came into his hands, he paid $1,000 to a contractor for repairs to the house and $900 to the younger

---

1. There was testimony that the grandmother is now deceased and that the grandfather is presently a patient at Saint Elizabeths Hospital.

Bells. The trial judge allowed these as valid credits. Evans retained the balance, claiming $300 for advances made to the younger Bells to tide them over during the transaction; $1,000 for his services; and the remaining $472.97 as a gift from the younger Bells for his many kindnesses. The younger Bells denied that Evans had loaned them $300 and Evans, who testified previously that he kept business records, produced neither records nor receipts showing such advances. His claim for $300 was disallowed. Evans testified that from the beginning he intended to charge a fee of $1,000, although he could not anticipate at that time the extent of his services. On the other hand, the written agreement which he prepared and entered into with the younger Bells on July 24, 1953, specified that his compensation, if any, was to be a gift of the amount remaining after the repairs had been paid for and the title perfected. Evans never informed the younger Bells he was charging $1,000 for his services or that they were making a gift to him of $472.97. The trial judge disallowed both of these amounts as credits to Evans.

The testimony reveals that Evans engaged in yet another transaction on behalf of the younger Bells shortly after they obtained title to the property. It appears that they needed money and they executed another promissory note for $600 which Evans agreed to sell for them. He sold it to a note buyer for $480, retaining $180 for this service and disbursing the remaining $300 to the younger Bells. He claimed he actually kept only $147, the balance being used for recording, etc. The trial judge disallowed this claim for services and rendered judgment to the younger Bells in the amount of $1,996.02.

Appellant's principal contentions on this appeal are as follows: He should not have been held liable to the surety because (1) there was no privity between him and either the principals or the surety on the bond; (2) the surety was negligent or contributorily negligent in writing the bond; (3) there was no proof of his practicing any fraud on the surety nor was there any proof that the surety relied on his representations in writing the bond; and (4) the surety acted as a volunteer in purchasing the trust note. Appellee U. S. F. & G. argues that it was entitled to recover from Evans because as surety on the bond it became subrogated to the rights of the creditor (holder of the note) and the rights of the principals on the bond (the elder Bells).

Most of appellant's arguments may be answered rather summarily. In order to recover against Evans, it was not necessary for the surety to show it had been defrauded by him or had placed reliance on any representation made by him since its claim for recovery was based on subrogation. We cannot agree either that U. S. F. & G. acted as a volunteer. It paid its obligation only after demand was made by the holder of the note. Such demand was introduced in evidence with no objection by Evans. While there was no direct evidence that demand was made on the trustee or the principals on the bond, there is a substantial inference that this occurred and that the holder of the note was referred to U. S. F. & G., surety on the bond taken out to cover just such an eventuality. We do not think that anyone compelled to pay a debt is a volunteer. The claim that U. S. F. & G. was negligent is predicated on its failure to consult with the principals on the bond before writing it. Under the circumstances present here, we do not think such conduct was negligent; but even assuming that it was, where both parties are negligent and there is no superior equity, then the burden must fall on him whose negligence was the primary cause of the situation.[2] If Evans had carried out his duties with the care required, there would have been no necessity for the execution of a lost instrument bond.

2. See Schuessler v. Shelnutt, 233 Ala. 188, 171 So. 259.

■■ With regard to appellant's contention that there was no privity between him and either the principals or the surety on the bond, we need only state that subrogation does not depend on privity for its application.[3] It is based on principles of equity and natural justice and was adopted to compel the ultimate discharge of an obligation by a person who in equity and good conscience ought to pay it. Evidently aware that his argument concerning privity would not bear scrutiny, appellant has incorporated in it the further defense that the principals on the bond were the makers of the note and knew more than any other person where it was. This defense is asserted in response to U. S. F. & G.'s contention that it was subrogated to the rights of the principals on the bond. There is authority for U. S. F. & G.'s position.[4] But appellant does not argue that U. S. F. & G. could not be subrogated to the rights of its principals; he contends that even if U. S. F. & G. is subrogated to these rights, they are taken subject to all defenses, limitations and disqualifications incident to them. Therefore, the question is narrowed to whether the defense alleged is valid. We think not. While it is true the elder Bells were the makers of the note and were paying on it at the Seat Pleasant Bank, they made no attempt to deny this or conceal it from Evans. On the contrary, there was testimony that they wanted Evans to look at some old receipts they had and that he ignored them. Further, Robert A. Bell testified the purpose of bringing out the receipts was to show Evans evidence of recent payments. Under these circumstances, we cannot say that U. S. F. & G.'s rights as subrogee were diminished by the fact that its principals had knowledge of how the note could be located.

■ With regard to the cross-claim, appellant asserts that the younger Bells were not in equity with clean hands; that their claim was barred by laches and that the court erred in stripping him of all compensation for services rendered. In support of his first contention, appellant again argues that because the younger Bells knew their grandparents were paying the note at the Seat Pleasant Bank, they should be deprived of their status in a court of equity. We have already related evidence which reveals that the younger Bells attempted to clarify the status of the note and that Evans refused to concern himself with this information. Further, there was conflicting testimony as to whether Robert A. Bell knew about the bond. On such evidence we cannot say that the trial court was required to hold that the younger Bells knew the nature of the bond in question, that is, that it was a lost instrument bond. Nor do we think the trial judge was required to hold that the younger Bells had any reason to suspect that Evans was not performing his duties with the care required of a real-estate agent who had been in that business for over twenty years.

■■ Appellant's claim of laches is seemingly based on the failure of the younger Bells to demand an accounting at any time from the date of settlement in August 1953 up to March 1956 when the cross-claim was filed. Laches is an equitable doctrine and its applicability is dependent upon the circumstances of each case. Mere lapse of time does not constitute laches. Further, if the party interposing the defense of laches substantially contributes to the delay he is precluded from taking advantage of the defense.[5] The record shows that the Bells, because of their lack of knowledge

3. National Surety Corporation v. Allen-Codell Co., D.C.E.D.Ky., 70 F.Supp. 189.

4. National Surety Corporation v. Allen-Codell Co., supra; Maryland Casualty Co. v. United States, 32 F.Supp. 746, 91 Ct.Cl. 203; San Diego County v. Croghan, 2 Cal.App.2d 494, 38 P.2d 474; Stearns, Law of Suretyship, § 11.2 (5th ed. 1951).

5. Potash Co. of America v. International Min. & Chemical Corp., 10 Cir., 213 F.2d 153; In re Indiana Concrete Pipe Co., D.C.N.D.Ind., 33 F.2d 594; Spiller v. St. Louis & S. F. R. Co., 8 Cir., 14 F.2d 284, modified 274 U.S. 304, 47 S. Ct. 635, 71 L.Ed. 1060; Parker v. Parker, 5 Cir., 222 F. 186.

in real-estate matters, put their complete confidence in Evans to arrange the transaction for them. That they were unaware this confidence had been breached is all too clear. They were under the impression that the note had been paid and they had no reason to believe that the title had not been cleared in accordance with the purpose of Evans' employment. Further, the record reveals that they were of less than average intelligence, which fact the trial court was entitled to consider.[6] There is no evidence that the younger Bells knew that upon the termination of the principal and agent relationship the agent was required to account. Evans never revealed to them the charges he had made for his services or the amount of the gift which he claimed they made to him. However, as soon as they became aware of these facts, appropriate action was taken to compel an accounting by the filing of the cross-claim. Under such circumstances we cannot say that the trial judge should have held that their conduct constituted laches.

 With regard to the failure of the trial judge to allow him compensation for his services, appellant argues there was no evidence of fraud or overreaching by him toward his clients. He hinges this on the fact that he was, at the most, negligent in not finding the allegedly lost note. We fail to see what bearing his negligence in not finding the note would have on his duty to render to the Bells an accounting of the funds. No authority need be cited for the proposition that he owed a duty to account to his principals upon the termination of his agency. This he failed to do. It is readily apparent why. Out of the proceeds of two loans which amounted to $4,-

152.97, he kept for himself, for one reason or another, $1,952.97—almost half of what he obtained. We need not relate again how he attempted to justify this amount; we need only point out that he concealed from his principals the sums that he paid himself. He never informed the Bells what his services would cost them. The original written agreement of employment dated July 24, 1953, referred to his compensation as follows:

> "* * * after expenses and the contract price for renovation have been paid together with the necessary expenses of perfect[ing] title for their use and benefit; then remainder, if any will be a gift to Robert L. Evans for his services in connection for their use and benefit."

In a memorandum prepared by him and signed by the younger Bells on August 10, 1953, at which time he was fully aware of what the costs to them would be, he again referred to his compensation as "any money that is left after the full payments to [the contractor] and for the Title search." There can be no doubt that Evans breached his duty of good faith and loyalty to his principals; accordingly, we must agree with the trial court that such conduct disentitles him to any compensation for such services.[7]

 Two further points remain: Appellant has claimed that the judgments are cumulative and therefore exceed the jurisdiction of the court. We disagree. It is generally the rule that the amount stated in the complaint, and not the amount of recovery, determines the jurisdiction of the court.[8] Here the cross-claimants' pray-

---

6. McIntire v. Pryor, 173 U.S. 38, 19 S.Ct. 352, 43 L.Ed. 606.

7. Pennsylvania Trust Co. v. Billman, 3 Cir., 61 F.2d 382; Hansen v. Barnard, 2 Cir., 270 F. 163; Quirk v. Quirk, C.C. E.D.Pa., 155 F. 199; Keith v. Berry, D.C.Mun.App., 64 A.2d 300; Restatement, Agency, § 469.

8. Kunkel v. Brown, 4 Cir., 99 F. 593; Navarro v. Martin, 38 A.2d 691, 22 N.J. Misc. 291; 21 C.J.S., Courts, § 55. See also Goldberg v. Roumel, D.C.Mun.App., 40 A.2d 253; Hirshon v. Whelan, D.C. Mun.App., 113 A.2d 484, reversed 98 U.S. App.D.C. 82, 232 F.2d 339, original opinion reinstated, D.C.Mun.App., 122 A.2d 114.

er for relief against Evans asked for any amount found due and owing by them to U. S. F. & G. and also for any amount found due and owing by Evans to them. This language could not be interpreted to mean a claim for any more than the amount announced in U. S. F. & G.'s complaint, plus the difference between that amount and $3,000, the monetary limit of the jurisdiction of the Municipal Court. However, the trial judge evidently felt that he could not give the cross-claimants judgment for the amount they owed U. S. F. & G. since out of the total proceeds from both loans ($4,152.97) they had received for their benefit $2,200. He accordingly rendered judgment in their behalf for what he computed to be the difference between the two amounts—$1,996.02. In the event Evans should pay the judgment in favor of U. S. F. & G., such payment shall also constitute satisfaction of the judgment against him on the cross-claim. If the younger Bells should pay the judgment in favor of U. S. F. & G., their judgment on the cross-claim against Evans shall remain outstanding.

Finally, in the interests of fairness we correct an apparent miscalculation in the amount rendered on the accounting cross-claim. Evans received in his hands the total amount of $4,152.97. The trial judge credited him with validly disbursing $2,200 of that amount. He refused to allow Evans credit for the following claims: $1,000 for services; $300 for advancements; $472.97 as a gift; and $180 for services in selling the second note. The total of these disallowed credits is $1,952.97, or the difference between the amount allowed as credits and the total proceeds which Evans received. The judgment on the cross-claim is therefore modified to $1,952.97 and as modified is affirmed. The judgment in favor of U. S. F. & G. against Evans for $2,423.05 is affirmed.

Affirmed.