### BARSTOW et al. v. BECKETT et al.

#### (Circuit Court, S. D. Georgia, E. D.   April 2, 1903.)

1. EXECUTION SALES—FRAUD ON DEBTOR—MENTAL INCAPACITY—SUIT TO REDEEM.

Decedent owned three tracts of city property, and also land on an island, where he lived; he being, if not actually insane, yet subject to delusions and incapable of protecting his interests. The first tract of city property, worth $10,000, was incumbered for $1,847, for which foreclosure judgment was taken by default. Execution was levied, and the tract purchased by K., acting for the creditor's attorney, for $500. Six days later K. sold a four-fifths interest for $1,400, and within the year the attorney's son, acting for his father, bought the remaining fifth for $350. Later the owners sold two-thirds for $2,500, and the remaining third for $1,500. A levy for delinquent taxes had been made on the island property, which was released, and another levy made on the second tract of city property, worth $15,000, and at the sale the creditor's attorney purchased for his client for $835. Execution was then levied on decedent's equity of redemption, which the creditor bought for $150. This tract was resold for $3,206.25. Another creditor, represented by the attorney's son, levied execution on the third tract, worth $4,000, which was sold to an agent of the first creditor for $500. Decedent's executor offered to redeem from all the sales. *Held*, that equity would entertain a bill by the heirs to redeem on payment of what was equitably due.

2. SAME—BONA FIDE PURCHASER.

A judgment creditor and her attorney, the latter of whom fraudulently procured the sale of the debtor's property under execution, himself becoming the purchaser both on his own account and for his client, are chargeable with notice, and are not bona fide purchasers.

8. SAME.

To support the defense of bona fide purchaser, as against a claim of fraud in the vendor's title, the purchase money must have been actually and fully paid.

4. SAME.

The fact that one has accumulated a fortune by dealing in real estate, and therefore must have known that land was offered her at a grossly inadequate price, will preclude the defense of bona fide purchaser to a suit to impeach her vendor's title as fraudulently acquired; but interest on the money paid by her may be allowed.

5. SAME.

Purchasers at judicial sale are not bona fide purchasers, as against a claim of fraud on the debtor in the sale; the doctrine of caveat emptor applying.

---

¶ 5. See Execution, vol. 21, Cent. Dig. § 770.

In Equity.

Hugh V. Washington, Peter W. Meldrim, William Garrard, and Jacob Gazan, for complainants.

Samuel B. Adams and A. Pratt Adams, for respondents.

SPEER, District Judge. Elias B. Barstow, deceased, was a citizen of Chatham county. He was the owner of considerable landed estate, among which was 1,200 acres on Wilmington Island, a body of land surrounded by the salt water estuaries making in from the ocean and the Savannah river. On this island was his home. He also owned several tracts of land south of the city of Savannah and now within its corporate limits. These tracts were divided into parcels, one of 50 acres, one of 67½ acres, and one of 20 acres. Barstow was a man of good family, originally of strong mind, and had been carefully educated. His mother, also a member of a well-known family, herself a lady of fine intelligence, late in life, it is said by some of the witnesses, became afflicted with vagaries which indicated that her mind was unbalanced.

Whether this be true or not, it is very plain from the evidence that, at the period covering the incidents involved in the litigation before the court, the mind of Elias B. Barstow, the son, had degenerated to that extent that, if he was not actually insane, he was wholly incompetent to protect his important interests from the perils by which it will be seen they were presently to be assailed. He lived a recluse, in a lonely locality on Wilmington Island. His lands there were worth about $11,000. He returned them for taxes at $44,000, a figure so excessive that the tax receiver of Chatham county declined to receive the tax accordingly. Although his lands were fertile, he refused either to rent or cultivate them, although frequent applications with that purpose were made to him. He alternately believed himself a pauper and the possessor of great wealth. He was the familiar in his fantasies of imaginary spirits, and was heard laughing and talking with them, and on occasion arrayed himself in rags, so that the spirits would come and confer with him. Although the owner of very large values for a long time unincumbered, he lived in great poverty and squalor, and apparently was only ministered to by one kind neighbor, a Mr. Oemler, who was also his cousin, and by a few poor negroes, who lived on the island with him, and who served him when they were not frightened away by his imaginary conversations with phantoms, which were not more real to his disordered faculties than to the simple and superstitious mind of these untaught Sea Island Africans. It is true that he was periodically addicted to the excessive use of intoxicants, but the testimony of those who knew him leads to the conclusion that his mind was even more unsettled in periods of sobriety than when under the influence of drink. It appears that he lived practically entirely alone at his remote home on the island the last three years of his life, getting worse all the time. This progressed until, as Mr. Oemler, who was a neighbor on the island, testifies, he (Oemler) told one of the men to keep watch on him, and report if he got ill, because witness did not think he was in the condition to take care of himself. The same witness learned that he was out of provisions, and

offered to furnish him anything that he needed. Finally, in September, 1898, after a considerable interval, during which time no one had seen him, his body was found lying across the bed in his lonely and squalid home. There were around the dead and putrefying remains of the master of this home, which might have been one of great ease and comfort, every indication that for months, and perhaps for years, no attention had been paid to the decencies common to those in his station of life. From these facts, while there is evidence in the record intended to show that he was capable of contracting and looking after his business affairs, the conclusion seems inevitable that Elias Barstow, for the last years of his life and at the time of the incidents material to be considered by the court, was non compos mentis, at least to the extent to render him incapable of protecting his interest.

It appeared that on the 12th day of June, 1895, more than three years before his death, Barstow had negotiated a loan with Isaac Beckett, an attorney at law representing a Mrs. Harriet H. Burch. Mr. Beckett was also a money lender, and, being the owner of the abstract of all the titles in Chatham county, was very familiar with the value of lands. He was also a neighbor of Barstow, having a home on Wilmington Island, and presumably knew or became aware of his condition. The debt secured by the mortgage became due in June, 1896, and was foreclosed in November, 1896. Judgment was taken by default. Execution issued thereon. The amount of judgment, principal, interest, and costs, was $1,847. This execution was levied on a tract of 50.26 acres of land within the corporate limits of the city. It is in evidence that this land was worth at the time, and of late years has always been worth, $200 an acre, aggregating more than $10,000. On April 6, 1897, this tract was sold by the sheriff of the city court, and bid off by Isaac Beckett, agent, for the sum of $500. On April 13th the sheriff made a deed to one Kennickle for $500. It appeared incontestably that Kennickle was acting for Beckett, who, it will be remembered, was attorney for Mrs. Burch, and Beckett paid Kennickle $100 to represent him in this matter. Six days after the sale to Kennickle, he resold four-fifths interest in this tract to Dorsett, Stone, Starr, and Gleason for $1,400—an increase, it will be observed, of nearly 200 per cent. in that period. On March 21, 1898, the remaining one-fifth interest of this tract was deeded to George, the son of Isaac Beckett, for $350, and George Beckett testified that he represented his father. Thus on this lot Isaac Beckett, in a little more than a year, made a profit of $1,250. On April 4, 1898, Dorsett, Stone, Starr, Gleason, and Beckett sold a two-thirds interest in this tract to a Mrs. Goerz for $2,500, and October 22d of the same year, or within a month after the death of Barstow, the remaining one-third interest was sold to the same party for $1,500. Thus during this period of Barstow's decadence and death, while that unhappy man, the possessor of means which, under sane management, would have paid the debt of Mrs. Burch 20 times over, and on a sale of the lot levied upon, fairly conducted, could not only have paid the debt, but realized a sum sufficient to have kept him in luxury for the rest of his life, presumably unconscious of this trafficking with his interest, was sinking with

swift decadence in his wretched abode near the city. By this scheme, of which Isaac Beckett was plainly the promoter, the beneficiaries were enabled to make an advance of 700 per cent. on their original advancement. While this was true, and although the property sold was many times the value of the mortgage, there yet remained open on this lien an indebtedness against Barstow of more than $1,300. This, we will see, was soon made available to appropriate other holdings of this unfortunate man in a manner equally unconscious and inimical to the plainest principles of equity and natural justice.

In the meantime, with the usual indifference to their interests of men of disordered minds, Barstow had permitted state and county taxes to accumulate against him in the sum of $835. This had been levied by J. T. Ronan, sheriff of Chatham county, on a portion of his Wilmington Island lands. It appears, however, from the evidence, that this levy was canceled, and significantly enough another levy was made by the sheriff, and this time on 67½ acres of city lands, lying contiguous to the 50-acre lot, the disposition of which has been already mentioned. More significant still is the fact that the entry of levy on this latter tract is made in the handwriting of Isaac Beckett. When brought to sale on a tax fi. fa., this tract of land was sold to Isaac Beckett, as agent for Harriet H. Burch, for $835. Barstow, however, under the law of Georgia, had the right to redeem this land in one year, and it was necessary to Beckett's purpose to prevent this. He therefore caused the execution already obtained by Mrs. Burch on her mortgage to be levied on Barstow's equity to redeem this land from tax sales given him by the law of the state. October 5, 1897, this was sold to Mrs. Burch for $150. Thus Barstow, who, we are satisfied, was wholly incapable of looking after his affairs, and who was represented by nobody, was deprived of land worth $15,000 for $985. It is perfectly evident that this action of Beckett in selling Barstow's equity to redeem the land from the tax sale was not done to strengthen the security of his client, Mrs. Burch; for, had the land been redeemed, the lien of her judgment, which appears to have been the only one against Barstow after the tax execution was settled, would have attached to all the values thus redeemed, aggregating, as we have seen, in the neighborhood of $15,000. His action was evidently taken, therefore, not to save his client, but to preclude the unfortunate debtor from any chance to save the large values which he had caused the sheriff to levy upon when that official had levied elsewhere. The land, which Mrs. Burch thus obtained for $985, on February 14, 1899, she sold to Postell, Harrison, Fuchs, Starr, and Dillon for $3,206.25. Of this sum these purchasers only paid $1,000, and Mrs. Burch took a security deed from them for the balance. Her profit on the sale of this tract of Barstow's property was $2,221.25, largely more than her judgment against him. And thus, we have seen, on the two tracts her profit was $3,471—nearly twice as much as the principal and interest originally due on her mortgage.

In the meantime, however, Barstow had insanely quarreled with his attorney, Mr. Cronk, who had apparently done all he could to save him, and Cronk had obtained a judgment against him for fees. This was levied on the remaining tract of 20 acres. George Beckett,

the son of Isaac, was attorney for Cronk, and when this land, worth $4,000, was brought to sale, it was knocked down to C. H. Dorsett, as agent for Mrs. Burch, for the sum of $500. This was done at the instance of Isaac Beckett. Notwithstanding this swift appropriation of Barstow's estate, there appears yet unsatisfied, on the mortgage for $1,500, $1,242 principal. Thus sales of Barstow's property amounting in the aggregate to $23,552 have been so managed as to satisfy a little more than $250 of the principal debt of $1,500, leaving $1,242 of the principal and interest still unpaid.

W. W. Gordon, Jr., the administrator of the estate of Elias B. Barstow, shortly after his appointment, offered to redeem these lands, to pay all the sums which were equitably due to either and all of these parties, and thus recover the large values involved for the heirs at law of his intestate. He made the proposition to Beckett, who was the promoter of all these schemes and the organizer of all the syndicates engaged in these deals with the property of Barstow before and after his death. Beckett refused the offer and informed him that it was too late. Whereupon a bill was filed on the part of the heirs at law of Barstow in which they offer to do equity, pay everything for which the estate was in equity and good conscience liable, and redeem lands worth in the neighborhood of $25,000, of which Barstow, while incapable of managing his own affairs, had been deprived under the guise of fair judicial sales, which produced in the aggregate $1,835.

The case involved an exceedingly interesting and extensive discussion of a vast multitude of precedents. The controlling principles, however, seem simple, and are easily determinable by reference to decisions of the court of paramount authority. The great basic equity of the complainants' demand is that Barstow was deprived of his lands when he was non compos mentis, and, even if his mental weakness or imbecility had been of less degree, it would be the duty of a court of equity under the circumstances to protect it. The principle announced in the case of Allore v. Jewell, 94 U. S. 506, 24 L. Ed. 260, is as follows:

"Whenever there is great weakness of mind, though not amounting to absolute disqualification, arising from age, sickness, or any other cause, in a person executing a conveyance, and the consideration given for the land is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside."

The facts in that case are very similar to these before the court, though perhaps not so strong, to show mental incapacity. Said Mr. Justice Field, for the court:

"Numerous witnesses were examined in the case, and a large amount of testimony was taken. This testimony has been carefully analyzed by the defendant's counsel; and it must be admitted that the facts detailed by any one witness with reference to the condition of the deceased previous to her last illness, considered separately and apart from the statements of the others, do not show incapacity to transact business on her part, nor establish insanity, either continued or temporary. And yet, when all the facts stated by the different witnesses are taken together, one is led irresistibly by their combined effect to the conclusion that, if the deceased was not afflicted with insanity for some years before her death, her mind wandered so near the line which divides sanity from insanity as to render any important business

transaction with her of doubtful propriety, and to justify a careful scrutiny into its fairness."

This decision has been followed and applied in a great number of cases. See 9 Rose's Notes on U. S. Reports, pp. 137, 138.

In the case of Schroeder v. Young, 161 U. S. 334–345, 16 Sup. Ct. 512, 40 L. Ed. 721, we find a case strikingly similar to that at bar. There an interest worth $26,000 was sacrificed at several judicial sales to pay judgments of little more than $1,700. Mr. Justice Brown, for the court, held that:

"While mere inadequacy of price has rarely been held sufficient in itself to justify setting aside a judicial sale of property, courts are not slow to seize upon other circumstances impeaching the fairness of the transaction as a cause for vacating it, especially if the inadequacy be so gross as to shock the conscience. If the sale has been attended by any irregularity, as if several lots have been sold in bulk, where they should have been sold separately (as was done in the case before the court), or sold in such manner that their full value could not be realized; if bidders have been kept away; if any undue advantage has been taken to the prejudice of the owner of the property, or he has been lulled into a false security; or if the sale has been collusively or in any other manner conducted for the benefit of the purchaser, and the property has been sold at a greatly inadequate price—the sale may be set aside and the owner permitted to redeem."

There is also a most significant similarity in the fact that the attorney for the judgment creditor was alleged to have occupied the attitude in which the evidence places Mr. Isaac Beckett in the case before this court. This, in addition to the grossly inadequate price realized for the property, the court observes, affords ample justification for the action of the court below in permitting the plaintiff to redeem upon equitable terms and order a reconveyance of the property. The property was sold to Stephens and Schroeder, who had acted as attorneys for the judgment creditor toward the entire transaction. "In this connection, the trial court further found that Stephens furnished the officer a description of the property to be levied upon and sold, and that he accordingly did levy upon and sell as he was directed by Stephens according to such description. Add to this the further finding that at neither of the sales was there any other bidder and no other person present than Stephens and the officer conducting the sales, and we can readily appreciate how inevitable it was that the property should be sacrificed. Although there is no general rule that an attorney may not purchase at an execution sale, provided it be not done to the prejudice of his own clients, such purchase in itself is calculated to throw a doubt upon the fairness of the sale, and, as is quaintly said of such sales by the Court of Appeals of Kentucky, in Howell's Heirs v. McCreery's Heirs, 7 Dana, 388: 'Public policy, and the analogies of law require that they should be considered per se as in the twilight between legal fraud and fairness, and should be deemed fraudulent, or in trust for the debtor, upon slight additional facts.' "

It seems wholly superfluous to multiply precedents where such authoritative decisions are afforded from the supreme appellate court of the nation. It is, however, true that a most important case will be found in Graffam v. Burgess, 117 U. S. 180–197, 6 Sup. Ct. 686, 29 L. Ed. 839. The decision was rendered by Mr. Justice Bradley.

122 F.—10

He discusses the facts with the remarkable acuteness and penetration which marks all of his decisions. That was a case of judicial sale of real estate with great inadequacy of price, and the court held that in the presence of such facts only slight circumstances of unfairness in the conduct of the party to be benefited by the sale is necessary to raise a presumption of fraud. It is further held:

"If the inadequacy of price paid for the purchase of real estate at a sale on an execution be so gross as to shock the conscience, or if, in addition to gross inadequacy, the purchaser has been guilty of unfairness, or has taken any undue advantage, or if the owner of the property or the party interested in it has been for any other reason misled or surprised, then the sale will be regarded as fraudulent and void, and the party injured will be permitted to redeem the property sold."

A large number of cases are cited in the opinion, all of which strongly sustain the rights of the complainants now before the court. In several of these the courts animadvert upon the sales for grossly inadequate prices when the purchaser was an attorney in the case.

In Byers v. Surget, 19 How. 303, 15 L. Ed. 670, Mr. Justice Daniel said for the court:

"Such is the history of a transaction which the appellant asks of this court to sanction; and it seems pertinent here to inquire under what system of civil polity, under what code of law or ethics, a transaction like that disclosed by the record in this case can be excused, or even palliated."

In both of the cases cited there were dissents, not, however, upon the general equity involved, but upon the fact that there had been no effort to redeem the real estate within the statutory period fixed by the statute law. It is obvious that the principle of these dissents would not apply to a case where the defendant in execution was incapable from mental infirmity of looking after his interests or of making an offer to redeem in the proper time. There are cases where the fraud is so gross that even laches on the part of persons wholly incompetent will not defeat the right of redemption by the debtor. Such a case was that of McIntire v. Pryor, 173 U. S. 38–59, 19 Sup. Ct. 352, 43 L. Ed. 606. This was a persistent effort on the part of McIntire to make himself the owner of the property. There the defendants were ignorant and helpless people. The bill was filed after a delay of nine years and four months, and yet fraud was held to be so glaring as to defeat the plea of laches. A number of cases are cited by the court, the substance of which may be expressed in the forceful language of Mr. Justice Story, in Prevost v. Gratz, 6 Wheat. 481, 5 L. Ed. 311:

"It is certainly true that length of time is no bar to a trust clearly established; and, in a case where fraud is imputed and proved, length of time ought not, upon principles of eternal justice, to be admitted to repel relief. On the contrary, it would seem that length of time, during which the fraud has been successfully concealed and practiced, is rather an aggravation of the offense, and calls more loudly upon a court of equity to grant ample and decisive relief."

It is said, however, that these defendants are entitled to the equity of bona fide purchasers without notice. This is certainly not true of Beckett, or of Mrs. Burch, for whom he acted as agent throughout. She is directly chargeable with notice of all the facts which he

acquired in the execution of his wholly unjustifiable purposes. It is not true of Postell Harrison, Fuchs, Starr, and Dillon; for they have not paid the purchase money. To support the defense of bona fide purchaser without notice, the purchase money must have been actually paid.

It is, however, said that Mrs. Goerz is clearly an innocent purchaser without notice. It, however, appears from the evidence that this good lady has accumulated her fortune by dealing in real estate. She must have known the gross inadequacy of the price of the land offered her, and this notice would seem sufficient to have put her on inquiry. 1 Beach's Equity, § 354. She, therefore, would seem chargeable with knowledge of all the facts which inquiry would have developed. She must have known that Barstow was devested of this property by judicial sale and at a most inadequate price. The lawyer who represented her was Isaac Beckett. There is authority to the effect that the law considers the principal as affected with notice of all facts, notice of which can be charged upon the attorney. Smith v. Ayer, 101 U. S. 326, 25 L. Ed. 955; Rogers v. Palmer, 102 U. S. 263, 26 L. Ed. 164.

The other parties are either purchasers at judicial sales, where the doctrine of caveat emptor applies, or, having failed to pay the purchase money in full, cannot claim to be innocent purchasers in equity. The rights of Mrs. Goerz, while not sufficient, in the opinion of the court, to defeat the right of complainants, who ask the privilege of redeeming their lands, will yet stand on a better footing of equity and justice. On the whole, we are very clear that the prayers of petitioners' bill should be granted. That this persistent, continued, and deliberate scheme to deprive Barstow of lands amounting in the aggregate to nearly $25,000, by the skillful and adroit use of small executions and judicial sales at grossly inadequate prices and swift transfers of the property thereafter, while Barstow himself was incapable of protecting his rights, should be set aside and annulled.

A decree will be ordered directing the master to take an account of the sums equitably due each of the parties defendant, and, in view of the superior equity of Mrs. Goerz, she will be allowed legal interest on the sum ascertained to be due her, and, when those sums ascertained have been repaid, the deeds held by the parties defendant will be annulled, and reconveyances ordered, conformably to the equity of complainants' bill.