UNITED STATES CASUALTY CO. v. CHARLESTON, S. C., MINING & MANUFACTURING CO.

SAME v. VIRGINIA–CAROLINA CHEMICAL CO.

(Circuit Court, D. South Carolina. October 21, 1910.)

1. INSURANCE (§ 141*)—THE CONTRACT—EFFECT OF ACCEPTANCE AND RETENTION OF POLICY.

An assured who accepts and retains a policy without objection, in the absence of fraud or misrepresentation, is bound by its terms, and cannot plead ignorance of them, nor avoid them because not in accordance with the application or the agreement made in the preliminary negotiations.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 262; Dec. Dig. § 141.*]

2. INSURANCE (§ 141*)—THE CONTRACT—ESTOPPEL BY ACCEPTANCE AND RETENTION OF POLICIES.

Defendant during a number of years carried policies of insurance, known as employer's liability policies, issued by complainant, the premiums on which were based on the amount of the pay roll of the employés covered by the policies, estimated in the first instance and to be adjusted at the end of the terms on reports by defendant showing the actual amount paid. The negotiations were between defendant and an agent of complainant who took the applications and delivered the policies, and with whom settlements of the premiums were made. Twenty-eight of the 30 policies issued covered all of the employés of defendant, including the executive officers and office men. *Held*, that defendant, having accepted and retained such policies during their terms and having had the benefit of the insurance covering such employés, could not avoid payment of the premiums thereon on the ground that the applications provided that they should be excluded and that it did not read the policies.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 262; Dec. Dig. § 141.*]

3. INSURANCE (§ 188*)—ACTIONS FOR PREMIUMS—EMPLOYER'S LIABILITY POLICIES—PREMIUMS BASED ON PAY ROLLS—RIGHT TO AUDIT OF BOOKS.

In order to determine the amount of premiums to which complainant was entitled under the provisions of such policies, it had the right to an audit of defendant's books, pay rolls, and like documents.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 188.*]

4. INSURANCE (§ 181*)—PREMIUMS—WAIVER BY ACCEPTANCE OF LESS THAN AMOUNT DUE.

Complainant, having had no knowledge at the time the several settlements were made that the reports made by defendant did not include the salaries paid to such classes of employés, did not by accepting the premi-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ums based on such reports waive its right to recover the remainder of premiums to which it was entitled.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 181.*

Waiver by acceptance of premiums, see note to Life Ins. Clearing Co. v. Bullock, 33 C. C. A. 369.]

5. INSURANCE (§ 188*)—ACTION FOR PREMIUMS—LACHES.

By the terms of employer's liability insurance policies issued by complainant to the defendant, the premiums were to be computed on the actual pay rolls of defendant during the terms of the policies, including thereon all employés covered by the policies, and it was made the duty of defendant at the end of each term to make a report showing the amount of such pay rolls. The reports so made did not include the salaries paid to certain classes of employés covered by the policies, but complainant was ignorant of such fact, and, accepting the reports as correct, made settlements thereon. After the policies had all expired, it accidentally discovered such omissions, and within a reasonable time thereafter brought suit to recover the additional amount of premiums to which it was entitled. *Held,* that complainant was not barred by laches from maintaining the suit on the ground that in the meantime defendant had destroyed its original pay rolls, since it was its duty to make correct and complete reports, and, not having done so, to preserve the evidence the destruction of which was at its peril, and especially as it further appeared that it had summaries showing the totals of each week's pay rolls.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 188.*]

## In Equity.

In the year 1898, and previously thereto, the United States Casualty Company was engaged in the business, among other things, of writing policies of insurance known as "employer's liability policies," their principal place of business being in the city of New York, and they were represented in the city of Richmond, Va., by J. B. Moore & Co., their general agents at that place. At the same time the Virginia-Carolina Chemical Company, engaged in the manufacture of fertilizers situated in various states, applied for and obtained from the United States Casualty Company policies of insurance covering the various plants owned, operated, and controlled by it. It appears from the evidence in the case that the manner of conducting this business, briefly stated, was as follows: Moore & Co. would make a memorandum of what was desired upon certain blanks which they had for that purpose, specifying the amount of insurance desired, the location of the plant, and the employés to be covered. These papers were retained by Moore & Co., became a part of their office files, and that firm, having gone out of business, passed them on to their successors, by whom they were finally turned over to the defendant. Upon the trial of the case, these papers were put in evidence by the defendant's witnesses, who testified also that copies thereof, containing the information upon which these policies were thereafter to be issued, were sent from time to time to the home office of the casualty company.

It is also shown by the testimony that, in due course of business, following the plan adopted by the casualty company and constituting its method of doing this business, the policies desired by the chemical company were prepared from the papers thus furnished from the office of Moore & Co., were forwarded to the latter concern at Richmond, and were, in due course, delivered to the chemical company, which in every instance retained the policies without protest or objection. Thirty policies were issued under this arrangement and in the course of business thus outlined; the first being issued in the month of May, 1898. More particular reference will hereafter be made in this statement to the classes of policies as the same were treated before me in the argument of the case.

It is insisted by the complainant that the premiums upon these policies were to be calculated upon the estimated pay roll of the defendant company

at each of the plants from time to time covered under these policies respectively, and, at the end of the policy period, the amount of the actual pay roll was to be reported to the casualty company, and a premium based upon such actual pay roll was to be paid. Taking the policies as issued and retained by the assured as the contract between the parties by which their rights are to be determined in this proceeding, it appears that all the 30 policies sued on in this cause, with two exceptions, include within their terms the estimated pay roll of the ·chemical company at the respective plants named in the policies and the wages of all executive officers, office men, and piece workers employed in the factories or shops without exception. The two exceptions noted here are policy L 33,964, Virginia-Carolina Chemical Company, from November 26, 1900, to May 12, 1901 (Exhibit C), and policy L 13,975, Navassa Guano Company, from May 12, 1898, to May 12, 1899 (Exhibit II). These policies except from their terms executive officers and office men; so persons in the employ of the chemical company within this description are not to be included in the estimated pay rolls upon which the premiums upon these two policies are to be calculated.

The remaining 28 policies cover, as has been stated, all the employés of the chemical company without exception.

At various times during the currency of this insurance, settlements were made between the chemical company and the casualty company; the latter relying upon the statements of the pay rolls furnished by the former and accepting the same at the time as correct.

It is also contended by counsel for the complainant that, subsequent to such settlements, it was brought to the attention of the officers of the casualty company that the chemical company had claimed before a legislative committee, having under consideration some matters affecting the interest of the chemical company, that that company was employing a number of persons considerably in excess of those who had been reported to the casualty company as upon its pay rolls at the time of such settlements. The casualty company thereupon set on foot an investigation into the matter and discovered that the chemical company had not made full report of the number of persons upon its pay rolls, and it subsequently developed that that company claimed that such actual pay rolls so to be furnished to the casualty company were not to include certain classes of employés which it insisted were expressly excepted from the terms of the policies. Some correspondence then ensued between the parties, and the final outcome was the institution of these proceedings.

Pending the suit the parties, by agreement, had an audit made of the books and records of the chemical company, the result of which is in the form of statements showing the amount due in the event it is held that the employés of all classes are to be taken into account, which statements have been filed with the record.

Similar bills of complaint were contemporaneously filed against the Charleston, S. C., Mining & Manufacturing Company, and a stipulation was made in the cause to the effect that this cause was to be heard together with the cause second above entitled and upon the same record and is to abide the result of the last mentioned cause.

It is contended by the defendant that in the year 1898 the late Mr. J. B. Moore, of Richmond, a friend of Mr. S. D. Crenshaw, who was then auditor and shortly thereafter became secretary of the defendant, solicited its business; that Mr. Moore did business under the firm name of J. B. Moore & Co., but had no partners and was the general agent of the complainant in Richmond; that the solicitation of Mr. Moore resulted in business relations ·between the parties, which was carried on by Mr. Crenshaw on the side of the defendant, and by Mr. Moore on behalf of the complainant, until late in 1902 or the early part of 1903; and that Mr. Moore never saw or had any dealings with any officer of the complainant until after suit had been instituted and testimony was being taken, 10 years after the business began.

It is further contended that this relation continued for about five years, or until March, 1903, when the defendant withdrew its business; that during all this period not a single direct communication between the parties took

place; that the conduct of the whole business was in the hands of Mr. Moore; that all premium payments were made to him; and that he saw to all payments for first aid when accidents occurred, conducted the settlement of cases, and, in short, acted as the casualty company. Also, that he negotiated as to what or who was to be covered by the policies and delivered them over; that his activity in the matter was such that he himself prepared the blanks giving the data for the policies to be issued; and that not a single blank was ever signed by the defendant.

It is claimed, moreover, that the general agents of the casualty company received 25 per cent. of the premiums paid as compensation; that the Virginia-Carolina business was originally written at a premium rate of 42 cents per $100 of wages paid; that, instead of receiving 10½ cents, Moore received 17 cents of this, 42 per cent. of the premium; that this extraordinarily large compensation was for his extra work in connection with the business; and that, naturally, as he had apparently full responsibility and discretion, it was only fair to him that he should have extra pay.

And it is further insisted that the information as to factories, workmen, and pay rolls was given him from time to time, as the business went on, upon the basis of which policies were issued and premiums computed and paid; that this information was full and truthful and covered the risks insured against; that he knew precisely the understanding which he had with Mr. Crenshaw as to these matters; that this understanding was also known to others who were in his office, and his son J. B. Moore, Jr.; that yearly settlements were made on this perfectly known basis, and all matters were supposed to be closed when the business was withdrawn.

Also, that Mr. Moore never asked for an audit of the defendant's books, and nothing more was heard from him after the business was terminated; and that the complainant never attempted to secure from him any account of premiums other than those he had reported in accordance with his prior accounts. The defendant also claimed that in 1903, within a month or so of the end of the said relationship, and as a result of a conversation with counsel, who repeated some hearsay remarks supposed to have been made on behalf of the company in opposing hostile legislation in South Carolina, the complainant's president thought there might be something more due to his company and sent down an auditor to look over the books of the defendant, and that "very likely the smart of having lost the business may have also been a factor in this move." That, at all events, an auditor went down to Richmond early in May, 1903, and remained there a month. This auditor testified that his examination was restricted to the last two years of the period; the pay rolls for the prior years having been refused him. That he tries to make it appear that he went back to Richmond in the fall of the same year to make an audit of the defendant's books, but on cross-examination admitted that he had other work there and received no instructions as to them, and that his visit had nothing to do with this matter. He said that he arrived in Richmond September 2, 1903, and on October 2d the casualty company appears to have written the defendant asking for an audit; but this letter, though it may have been delivered, was never brought to the knowledge of the company's officers, and remained unanswered, and no further steps in the matter were taken by the casualty company, which remained apparently satisfied just as Moore & Co. had been. Mr. Moore in the meanwhile had died in July, 1905, and, in the natural course of business, all the policies which had been issued, except those covering the last year of insurance, were lost or destroyed.

Three years after the last policy had expired, suit was instituted in 10 jurisdictions, and voluminous bills in equity were filed setting up the alleged provisions of policies covering a period of five years, charging the defendant with fraud, concealment, and misrepresentation, and demanding audits and accountings. Interrogatories of the most sweeping nature were annexed.

The brief of the defendant, among other things, contains this clause: "Realizing that the intricate nature of the action and the difficulties which the court would have, should the question of proving figures be gone into, and strong in the consciousness of its own propriety of conduct throughout,

the defendant consented to a complete audit of all of its pay roll records of factories and mines, and a full examination was made by auditors representing both parties. It also furnished to the complainant a complete record of all its other expenditures in salaries and wages from the president down to the humblest employé during the whole five year period, and all these masses of figures have been tabulated and cast into such form that their volume need no longer be a terror to the court."

Mordecai & Gadsden and Rutledge & Hagood, for complainant.
Oudin & Oakley and Lindabury, Depue & Faulks, for defendants.

PRITCHARD, Circuit Judge (after stating the facts as above). It is insisted by the complainant, as will appear from the statement of facts, that the policies issued by it to the defendant, with the memoranda and schedules thereto attached, constitute the contract between the parties; and that the pay rolls required to be furnished thereunder, in order that the actual premiums should be determined, should have included the amounts paid all employés of the company, without exception. In other words, that executive officers and office men should have been included in such pay rolls. And, as supplementary to this, that the complainant had, and still has, a right to an audit of the defendant's books, pay rolls, and similar papers.

The defendant, as respects this point, contends that only persons engaged in the actual manual labor of manufacturing fertilizers were to be included in the actual pay roll expenses, as reported at the end of the year. It appears from the evidence that the data furnished to Moore & Co., the agents of the plaintiff, by the agent of the assured, and in turn by Moore & Co. to the New York office, in order that the policies might be made up, excepted the class of employés known as "executive officers and office men," from those to be included within the terms of the insurance; but it also appears that, in the actual making up of these policies, this class of employés was included except in policy L 33,964, Virginia-Carolina Chemical Company, from November 26, 1900, to May 12, 1901 (Exhibit C); and policy L 13,975, Navassa Guano Company, from May 12, 1898, to May 12, 1899 (Exhibit H).

It appears that the policies containing the words "executive officers and office men" were sent to the assured and received by it, and that no objection was made to the fact that such class of employés was included therein.

In the case of Weinberger v. Merchants' Insurance Co., 41 La. Ann. 31, 5 South. 728, a similar state of facts existed. In that case an application was made and accepted subject to all other clauses and conditions of the policy of the company, and in the application, among other things, it was provided that the vessel was to "navigate the Gulf of Mexico, the Caribbean Sea, and the Atlantic Coast, so far up as Boston." The condition of the policy referred to in the application as being the one to which it was subject was as follows:

"Warranted by the assured not to use port or ports in Eastern Mexico, Texas nor Yucatan, for anchorage therefor during the continuance of this insurance."

The action in that case was based upon a claim for damages sustained "from encountering violent gales from Galveston, Tex., to Vera Cruz, in Eastern Mexico." The court said, in this case:

"The written part of the application forms a part of the policy, and is copied and incorporated in the policy, and thus the application and the policy form but one contract. The policy was delivered some 15 days after the application was made. The assured cannot plead ignorance of the clause in the policy. It was their duty to read the policy, so as to determine whether or not it was made in accordance with the application. The defendant company insures vessels navigating the seas, but has clauses in its policies excepting certain ports and localities from its risks. A person dealing with an insurance company ought at least to know the general course of its business, and, if he desires exceptions in policies to be avoided, he ought to state the fact in his application, and be willing to pay the premiums for the risk."

The principle that, in the absence of fraud, a party accepting a contract without objection is bound by all its recitals, covenants, and conditions, is well established. That preliminary negotiations and arrangements, in order to secure the issuance of a policy, should be taken in subjection to the terms of the policy, as the same may be written, is the universal rule; and the contract, in this instance, must necessarily be determined by an examination of the policies themselves and the provisions thereof, which, from the very nature of things, necessarily control.

The evidence shows that the defendant received these policies and, without reading them and ascertaining the provisions contained therein, put the same in a place of safety. It was the duty of the defendant, under the circumstances, when the policies were received, to examine them, and, if they contained any provisions that were not in accordance with the terms agreed upon, the defendant could, then and there, have returned the policies and relieved itself from any obligation thereunder; but this was not done, while, on the other hand, as I have stated, the policies were accepted, and the complainant was permitted to assume any and all liability attaching thereunder, on account of any accidents that might occur to the laborers employed as well as the executive officers and office men. Under these circumstances, if any of the executive officers or office men had been injured, undoubtedly the complainant would have been liable under the policies for damages resulting from such injury.

In the case of Morrison et al. v. Insurance Co. of North America, reported in 69 Tex. 353, 6 S. W. 605, 5 Am. St. Rep. 63, the Supreme Court of Texas passed upon this question. The rule is thus stated in notes 1 and 2 of the syllabus of that case:

"In an action on an insurance policy, a pleading which sets up that the party failed to perform the conditions in the policy because of ignorance of such conditions, but which fails to allege fraud, misrepresentation, or concealment, is insufficient as a defense.

"An insurance policy contained a provision that the procuring or having other insurance on the property not made known to the company, and consented to thereon, would render the policy void. In an action on the policy, plaintiff offered to show that the agent, who was shown to have had power to issue and cancel policies and make indorsements of other insurance when necessary, was informed of the other insurance complained of, made no objection thereto, but promised to indorse it on the policy; that plaintiff

relied on such promise; and that, just before the loss occurred, the agent arranged to renew the policy at its expiration, and a memorandum for renewal was made, with such reinsurance contained in it, but it was never indorsed on the policy. *Held*, that the company was bound by its acquiescence in such acts of its agents, although the policy contained a clause that no agent had authority to bind the company in violation of any of the printed terms of the contract, and no condition or restriction contained in the policy, which by its terms may be waived, shall be deemed to have been waived, except by distinct agreement contained in the body of the policy; this clause having no reference to the subject of reinsurance."

In that case it was alleged that the failure to perform the conditions of the policy was due to ignorance of certain conditions. The court clearly disposes of the point involved by holding that, in the absence of allegations of fraud, misrepresentations, or concealment, one would not be entitled to plead ignorance as a defense. This is the principle which applies to all contracts where one seeks to alter or control a written instrument by parol evidence. In the case of Insurance Co. v. Mowry, 96 U. S. 544, 24 L. Ed. 674, the court, among other things, said:

"But to this question there is an obvious and complete answer. All previous verbal arrangements were merged in the written agreement. The understanding of the parties as to the amount of the insurance, the conditions upon which it should be payable, and the premium to be paid, was there expressed, for the very purpose of avoiding any controversy or question respecting them. The entire engagement of the parties, with all the conditions upon which its fulfillment could be claimed, must be conclusively presumed to be there stated. If, by an inadvertence or mistake, provisions other than those intended were inserted, or stipulated provisions were omitted, the parties could have had recourse for a correction of the agreement to a court of equity, which is competent to give all needful relief in all such cases. But, until thus corrected, the policy must be taken as expressing the final understanding of the assured and of the insurance company."

In the case of Accident Insurance Co. v. Crandal, 120 U. S. 527, 7 Sup. Ct. 685, 30 L. Ed. 740, the third note of the syllabus is in the following language:

"Statements in an application for a policy of insurance, expressing the applicant's understanding of what will be the effect of the insurance, cannot control the legal construction of the policy afterwards issued and accepted, although the application warrants the facts stated therein to be true, and the policy is expressed to be made 'in consideration of the warranties made in the application.' "

There are some cases in which a different rule has been announced, notably among those being Fireman's Fund Insurance Co. v. Norwood, 69 Fed. 80, 16 C. C. A. 137. However, in that case Judge Sanborn wrote a strong dissenting opinion, in which, among other things, he said:

"There is no doubt that there are cases where one party to a written contract has been so imposed upon by the fraudulent representations of its contents, or by some artifice or deceit of the other party, which prevents him from reading it, that he may be excused for ignorance of its contents. But I cannot subscribe to the proposition that a mere statement or agreement as to the terms of the proposed contract, made in the preliminary oral negotiations which result in the subsequent written contract, will excuse either party from reading the contract when it is delivered, or will reverse the

settled rule that the written contract must prevail over the preliminary negotiations. It is the duty of every party to a contract to read it and to know its contents when he has an opportunity to examine it before he accepts, and, in the absence of fraud, concealment, or misrepresentation, as to its contents, he must be conclusively presumed to have knowledge of them. Contracts for insurance furnish no exception to this rule."

There it appears that the plaintiff had examined the policy, and, finding the amounts corect, did not further examine it, owing to a conversation which he had with the agent, and placed the same in his safe, and the company, by delivering the policy with knowledge through its agent as to the amount of insurance to be taken, waived the condition as to other insurance and was, therefore, estopped to assert the same as a defense under the law, inasmuch as the plaintiff had the right to rely upon such knowledge of the agent. There is nothing to be found in that case which seriously conflicts with the rule here announced.

That the plaintiff has the right, in order to determine the amount of premiums to which it may be entitled, to an audit of the defendant's books, pay rolls, and like documents, under the clause in the policy to which reference has been made, has been determined in numerous cases, notably being Swedish-American Telephone Co. v. Fidelity & Casualty Co., 208 Ill. 562, 70 N. E. 768; also in the case of Fidelity & Casualty Co. v. Seagrist, etc., Co., 79 App. Div. 614, 80 N. Y. Supp. 277, and United States Casualty Co. v. Robins Co., 108 App. Div. 361, 95 N. Y. Supp. 726.

The next question to be determined is as to whether the claimant, by accepting the annual payments of the premiums, thereby waived its right to recover in this proceeding against the defendant such excess of the actual pay rolls over the amounts included in the annual settlements. It is apparent from the evidence that, when these annual settlements were made, a number of the employés of the defendant were not included within the pay rolls, then used as a basis of settlement, and it is insisted that as a result of an audit made, during the progress of the cause, over $600,000 of wages to such officers and employés were found not to have been included in the annual settlements. The fact that executive officers and office men were included in the policies and employed by the company was peculiarly within the knowledge of the defendant, and, from the very nature of things, the complainant could not have had knowledge of these facts at the time the settlements were made. It was shown by the evidence that the complainant had no knowledge of any failure on the part of the defendant to include as a part of its pay rolls this class of men.

It is well settled that, to constitute a waiver, the party affected thereby must have knowledge of the facts and be fully informed as to the voluntary surrender of any right arising out of the facts thus within his knowledge. In the case of Insurance Co. v. Wolff, 95 U. S. 333, 24 L. Ed. 387, among other things, the court said:

"To a just application of this doctrine, it is essential that the company sought to be estopped from denying the waiver claimed should be apprised of all the facts—of those which create the forfeiture, and of those which will necessarily influence its judgment in consenting to waive it."

In the case of Bennecke v. Insurance Co., 105 U. S. 359, 26 L. Ed. 990, the court said:

"A waiver of a stipulation in an agreement must, to be effectual, not only be made intentionally, but with knowledge of the circumstances. This is the rule when there is a direct and precise agreement to waive the stipulation. A fortiori is this the rule when there is no agreement either verbal or in writing to waive the stipulation, but where it is sought to deduce the waiver from the conduct of the party. Thus where a written agreement exists, and one of the parties sets up an arrangement of a different nature, alleging conduct on the other side amounting to a substitution of this arrangement for a written agreement, he must clearly show not merely his own understanding, but that the other party had the same understanding." Darnley (Earl) v. London, Chatham & Dover Railway Company, Law Rep. 2 H. L. 43.

There are many other cases in harmony with this rule, notably Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359; Scovil v. Thayer, 105 U. S. 143, 26 L. Ed. 968; Brant v. Virginia Co., 93 U. S. 326, 23 L. Ed. 927.

As already stated, the facts upon which it is insisted that the complainant has waived its right in this instance were peculiarly within the knowledge of the defendant. The complainant, relying upon the good faith and fair dealing of the defendant, entered into the annual settlements which are now sought to be used as ground upon which to base a waiver, and now comes into a court of equity for the purpose of seeking the compensation to which it would have been entitled in the beginning, had it been in possession of all the facts and circumstances surrounding the preparation of the pay rolls. In view of the evidence, I am impelled to the conclusion that the complainant has not waived its right to assert claim to any excess that may have existed over the pay rolls upon which these annual settlements were made.

Has the complainant been guilty of laches in the pursuit of its right, or, on the other hand, has it used proper diligence in the assertion of its right? It is insisted by the defendant in its answer that the complainant has been guilty of laches and is, therefore, not entitled to be heard at this time. Among other things, it is stated in the answer that certain records and information, which would have enabled it to entirely disprove the truth of the complainant's claims, "now for the first time set up" (had such claims been made within a reasonable time after the expiration of the policies), had been lost, and that it had been so prejudiced by the complainant's delay in bringing the action that it cannot now properly defend itself.

Being of the opinion that it was the duty of the defendant to furnish complete pay rolls, which would necessarily include executive officers and office men, each year during the period contained in the policies, it was the duty of the defendant to preserve the pay rolls; and, such being the case, if it destroyed its pay rolls and other documentary evidence, or put itself in a position where it could not comply with the terms of the contract which it had undertaken to fulfill, the defendant cannot now plead its own neglect as an excuse for not complying with the terms of its contract, or as a reason why the complainant should not

be permitted to assert its right. On this point it is insisted by counsel for complainant that:

"It appears very clearly from form No. 47, put in evidence, and from which was made up the report of the auditors who examined the books pendente lite, contains all the information necessary for the defendant now, and at the time of the commencement of this suit, to make full disclosure of its pay rolls as they stood during the policy periods. Mr. S. H. Malone, traveling auditor of the defendant, refers to these forms No. 47, which were used by this auditing committee, from which their report was made up, showing over $600,000 of compensation not reported to the complainant, as a 'factory weekly report covering the pay roll for that week, by the superintendent, which report includes all the labor and wages paid at the factory, the superintendent's salary, the clerical salaries, and every laborer in connection with the factory, and in some instances I have known it to be a fact that contract labor was put in form No. 47 and charged up to the distribution as mentioned.' See page 110. Mr. Malone also said that, as traveling auditor, he was familiar with the way in which the salary and wage records of the company had been kept, and in keeping these records the original pay rolls are condensed in form No. 47 for the purposes of record, and that thus the original pay rolls were only preserved for a while, possibly a year or so, until the end of the season, and then destroyed." See page 112.

Street's Federal Equity Practice, § 943, in referring to the defense of laches, says:

"The defense of laches arising from the staleness of the claim which supplies the basis of the bill is quite similar to the defense of the statute of limitations and is likewise available on demurrer. But if the bill shows in avoidance of the laches that the plaintiff was ignorant of the cause of action —and this without fault imputable to himself—and that as soon as the cause of action was discovered he bestirred himself diligently to obtain redress, the demurrer cannot be maintained."

In the case of Hanchett v. Blair, 100 Fed. 817, 41 C. C. A. 76, the court said:

"Laches which will bar a suit in equity depends on the peculiar circumstances of each case, and where the complainant's inaction does not appear to have worked injury to any one, and it is not shown that there was any occasion for more promptly asserting his rights, the defense will not prevail."

This view is sustained by the following cases: London & S. F. Bank v. Dexter et al., 126 Fed. 593, 61 C. C. A. 515; McIntire v. Pryor, 173 U. S. 38, 19 Sup. Ct. 352, 43 L. Ed. 606; Hammond v. Hopkins, 143 U. S. 234, 12 Sup. Ct. 418, 36 L. Ed. 134; Wilson v. Smith (C. C.) 117 Fed. 707; Wheeling Bridge, etc., Co. v. Reymann Brew. Co., 90 Fed. 189, 32 C. C. A. 571; Bissel, etc., Plow Works v. T. M. Bissel Plow Co. (C. C.) 121 Fed. 357.

Mr. Birdseye states that, when he attempted to examine the pay rolls during the spring and summer of 1893, and after many attempts to examine the same, the defendant refused to permit him to have access to them, stating as the reason therefor that the statute of limitations had then barred the claim. At page 60 et seq., Mr. Birdseye, among other things, said:

"Q. Did you after reaching Richmond under instructions have any communication with the Virginia-Carolina Chemical Company in reference to the auditing of pay rolls?

"A. I did.

"Q. Who did you see?

"A. I cannot say who I saw first. I went to the office and finally reached—I think the gentleman's name was Miller—who had charge of the room where the manufacturing pay rolls were kept. I saw a number of gentlemen. I think I saw Mr. Crenshaw, but whether immediately on reaching Richmond or later I cannot say. I noticed yesterday that his face was somewhat familiar.

"Q. Did you meet a gentleman by the name of Witherspoon?

"A. I did.

"Q. Will you please state, Mr. Birdseye, when you went to the office of the Virginia-Carolina Chemical Company for the purpose of making this audit what occurred.

"A. I went there, and I cannot say the exact number of people I met, but I finally found a gentleman in the charge of the manufacturing pay rolls and I told him who I was. I think I probably saw the secretary first and was referred to Mr. Miller—if the gentleman's name was. That was the one that I recollect I saw most of, and he gave me certain pay rolls.

"Q. What departments did those pay rolls cover?

"A. They covered the manufacturing only.

"Q. What years?

"A. 1901 and 1902.

"Q. Did you ask for any other pay rolls?

"A. I did.

"Q. What happened?

"A. They were refused.

"Q. What pay rolls did you ask for which were refused?

"A. For the pay rolls before the 1901 year.

"Q. How about the pay rolls of 1901 and 1902 other than manufacturing; they were refused?

"A. Refused.

"Q. So that in response to your demand the only pay rolls that were furnished you were the manufacturing pay rolls for 1901 and 1902?

"A. Yes, sir.

"Q. And all others were refused?

"A. Yes.

"Q. Did you leave Richmond?

"A. I did when I had stayed there long enough to have interviewed several gentlemen connected with the company trying to obtain the pay rolls and being refused.

"Q. You failed utterly?

"A. Failed utterly.

"Q. What was the length of time that you remained at Richmond for this specific purpose?

"A. I should say about a month, as I got there on the night of the 14th, and I think it was about the 11th or the 14th of June that I left."

Again, on page 68 et seq., Mr. Birdseye said:

"Q. Then what further application did you make?

"A. I afterwards saw— I won't say which I saw first, whether Mr. Borden or Mr. Witherspoon. One of the gentlemen, if I recollect rightly, had been out of town or sick, and I saw the other, and then I saw the one that had been sick or out of town.

"Q. What request did you make to them? And what did they say in answer?

"A. I requested the pay rolls, all the pay rolls for the time covered by our policies, and they refused to give me anything more than what I had.

"Q. Did they assign any reason for their refusal?

"A. They did.

"Q. What was that reason?

"A. The reason given was that the statute of limitations had run against me and I could not go back of the issue of 1901."

Mr. Miller, who was also a witness corroborates the testimony of Mr. Birdseye. On pages 209 and 210 et seq., his testimony in that respect is as follows:

"Q. Was it part of your duties during the period from 1898 to 1903 to have charge of the records of the manufacturing department?
"A. Yes.
"Q. In what form were those records kept?
"A. You refer now particularly to the pay rolls?
"Q. Yes.
"A. They came to us weekly on what is known as form 47, which is a condensed, tabulated report of the weekly pay rolls.
"Q. What has become of the original pay rolls, if you know?
"A. Well, they were, of course, always left in the factory offices for a sufficient length of time for any reference we might want to make to them for statistics. As far as I know, then they were destroyed, they were of no use any longer, because they were carried on to headquarters here in the form of other reports, this form 47, which was all we wanted."

In the case of O'Brien v. Wheelock, 184 U. S. 493, 22 Sup. Ct. 370 (46 L. Ed. 636), Chief Justice Fuller, among other things, said:

"The doctrine of courts of equity to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time is thoroughly settled. Its application depends on the circumstances of the particular case. It is not a mere matter of lapse of time, but of change of situation during neglectful repose, rendering it inequitable to afford relief."

Has there been such change of situation during what might be termed "neglectful repose" as to render it inequitable to grant the relief demanded? The defendant was the custodian of these pay rolls, and, according to the terms of the policies which it had in its possession, it was provided that the complainant should have the right at any time to an audit of the same. It was, therefore, the duty of the defendant to preserve the pay rolls or a record of them so that there might be at all times full and ample opportunity afforded the complainant to examine the same, and, according to the evidence of Mr. Malone, as will appear later, there was a record in the possession of the defendant from which an intelligent estimate could be made as to the actual amount of the pay rolls. The conduct of the complainant has not been such as to induce the defendant to do anything calculated to render it impossible for the complainant to assert any rights that it may have under the terms of the policies.

According to the testimony of Mr. S. H. Malone, traveling auditor of the complainant, the defendant has now in its possession all the information necessary to make a full disclosure of its pay rolls as they existed at the time the premiums were paid. Mr. Malone, among other things, on page 110, testified as follows:

"Q. In the spring of 1907, you and two auditors representing the complainant made an examination of the pay rolls of the Virginia-Carolina Chemical Company for the period covered by the policies in suit in this action?
"A. We made an examination of form 47, which is compiled from the pay rolls; but the originals of the pay rolls giving details and the name of each laborer were not in existence.
"Q. When you speak of form 47, what do you mean?
"A. I mean the factory weakly report, which is compiled at the factory, covering the pay roll for that week, by the superintendent, which report includes all the labor and wages paid at the factory, the superintendent's

salary, clerks' salaries, and every laborer in connection with the factory; and in some instances I have known it to be a fact that contract labor was put in form No. 47 and charged up to the distribution as mentioned there."

The witness also testified as follows on page 112:

"Q. As traveling auditor and as disbursing cashier for the Georgia Division, you were familiar with the way in which the salary and wage records of the company have been kept?

"A. Yes, sir.

"Q. And, in keeping those records, do I understand that the original pay rolls are condensed into what you call form 47 for the purpose of records?

"A. Yes, sir.

"Q. And the original pay rolls, after being so condensed, are no longer preserved?

"A. Well, they are preserved for a while, possibly a year or so, until the end of the season.

"Q. And then are destroyed?"

Thus it will be seen that the defendant was in a position to furnish the necessary data without the slightest inconvenience.

Following the rule as laid down by the Supreme Court of the United States, as well as other courts, I am of the opinion that the complainant has not been guilty of laches in this instance. It is therefore at liberty to assert any right to which it may be entitled under the provisions of the contract in this respect. It necessarily follows that the complainant is entitled to recover of the defendant premiums on the basis of the amounts paid by the defendant for compensation to its employés, which should include executive officers and office men during the respective policy periods to be ascertained hereafter.

It has been intimated that the parties may agree as to the amounts of the various pay rolls; however, if there should not be an agreement as to the amount involved, an auditor will be appointed in order that there may be an accurate report made as to the amount of pay rolls and as to the number of employés, including executive officers and office men, in accordance with the terms of the policies.