ALEX. SPRUNT & SONS v. C. C. MAY.

(Filed 9 November, 1911.)

1. Contracts, Wagering — Cotton — Future Delivery — Wholesale Dealer in Cotton—Evidence—Burden of Proof—Interpretation of Statutes.

A *bona fide* wholesale dealer in spot cotton who purchases the same for future delivery in the ordinary course of his business, under a contract valid on its face, is entitled to have his cause of action tried and determined, when resisted upon the ground that the contract is a wagering one and void under the statute, under the rule which generally obtains, that one who asserts that an "ordinary business contract, valid on its face, is unlawful, is required to prove it by the greater weight of the evidence." *Rodgers v. Bell, ante,* 378, cited as controlling this case in the interpretation of Revisal, secs. 1689, 1691.

2. Contracts, Wagering—Cotton—Future Delivery—Principal and Agent—Mutual Intent—Evidence.

A *bona fide* wholesale dealer who sues upon a contract for the future delivery of cotton, which is resisted on the ground that the contract was a wagering one and void under the provisions

of Revisal, sec. 1689, is bound by the acts and statements of his agents in negotiating and closing the trade, to the effect that actual delivery was not contemplated or required; and the plaintiff may not recover on the contract merely because he was a *bona fide* wholesale dealer in cotton and only authorized his agent to make a contract for actual delivery, if the agent at the time entered into a contract with the vendor which was condemned by the statute as being a wagering one.

### 3. Principal and Agent—Acts of Agent—Repudiation in Part.

One who sues on a contract made for his benefit by one assuming to act as his agent may not accept the benefits under the contract made for him and repudiate the agency as to those moving upon the same subject-matter to the other party.

### 4. Same.

When a recovery upon a contract valid on its face for future delivery of cotton, in an action brought by a *bona fide* wholesale dealer therein, is resisted upon the ground that the contract is a wagering one prohibited by statute, Revisal, sec. 1689, evidence is sufficient upon the question as to whether the actual delivery of the cotton was agreed on, which tends to show that, when the contract was being negotiated, the vendor, a farmer, did not have the cotton; that more cotton had been sold in that locality than could be delivered; that plaintiff's agent, who acted for him in the transaction, had an understanding with defendant that actual delivery of the cotton would not be required, but that the difference between the contract and market prices could be paid in money.

WALKER, J., dissenting.

APPEAL from *Peebles, J.,* at April Term, 1911, of NEW HANOVER.

Civil action to recover damages for an alleged breach of a written contract for delivery of cotton.

The evidence on part of plaintiff tended to show that on 9 September, 1909, defendant entered into a written contract with plaintiff, agreeing to deliver 100 bales of cotton at Trenton, N. C., between 15 September, 1909, and November, at the price of 12 cents per pound, and plaintiff agreed to accept same and pay the stipulated price. That defendant had failed to deliver said cotton or any part thereof, to plaintiff's damage $1,000. That the contract was negotiated, on part of plaintiffs, by one F. Brock, their agent, and signed by plaintiffs,

per F. Brock, agent, and by defendant. That plaintiffs were large dealers and exporters of cotton, supplying other dealers and mills in Europe, etc., and, through their agents, bought spot cotton, required for their business, in different sections of the country to the average amount of 400,000 bales annually. That plaintiffs intended, in good faith, to carry out the terms of the contract, and that no agent had authority from them to make purchases and contracts therefor with any other understanding.

Defendant, having filed a verified answer, alleging that the contract in question was a gaming contract prohibited by the statute, offered evidence tending to show that it was the understanding between defendant and plaintiff's agent, when contract was entered into, that actual delivery of the cotton was not intended, and that, on failure to comply, the demand could be satisfied by paying the difference, etc.

The court charged the jury. There was verdict in plaintiff's favor for $1,000 damages. Judgment on the verdict, and defendant excepted and appealed.

*Rountree & Carr for plaintiff.*

*T. D. Warren, J. K. Warren, Aycock & Winston, and P. M. Pearsall for defendant.*

HOKE, J., after stating the case: We have held, in *Rodgers v. Bell, ante,* 378, in reference to our statute as to gaming contracts, Revisal of 1905, ch. 36, that the words now appearing at the end of section 1689, to wit, "This section shall not be construed so as to apply to any person, firm, corporation, or his or their agent, engaged in the business of manufacturing or wholesale merchandising, in the purchase or sale of the necessary commodities required in the ordinary course of their business," by correct construction, should appear and only affect section 1691 of said chapter—the section relating to the burden of proof—and that, by reason of this clause, so placed, a *bona fide* wholesale dealer in spot cotton, who purchased the same in the ordinary course of his business, is not affected by said section, but is entitled to have his cause tried and determined under the rule, which generally obtains, that one who asserts

that an "ordinary business contract, valid on its face, is unlawful, is required to prove it by the greater weight of the evidence."

On the facts in evidence it appears that plaintiffs and their predecessors, under the style of Alex. Sprunt & Sons, from 1866, have been engaged in the cotton business, and since 1880 they have exported cotton in large quantities, supplying mills and dealers abroad, and, in the ordinary course of their business, they buy annually on an average 400,000 bales of cotton. They are, therefore, if the evidence is accepted by the jury, well within the clause withdrawing their case from the provision of section 1691, and, on another trial, the same will be submitted under the ordinary rules of evidence obtaining in such cases.

Objections were chiefly made to the validity of the trial for alleged error in a portion of his Honor's charge, as follows: "So, therefore, if you find as a fact that Alexander Sprunt & Sons were engaged in the wholesale cotton business here, buying cotton and shipping it to Europe, and that they had not been engaged and were not engaged in gambling contracts or futures with the expectation of taking margins or the difference between the contract price and the price at the time of the delivery, and that they did not authorize Brock to make any such contracts, but simply authorized him to make a contract for the actual delivery of the cotton, then you will find the first issue 'Yes.'"

As we understand it, the charge could only mean, and was intended, by his Honor, to mean that if plaintiffs were *bona fide* wholesale dealers in cotton, and only authorized Brock to make a contract for actual delivery, plaintiffs could recover for breach of a contract made by Brock, although in the negotiations and making of the contract there was an understanding between Brock and the other party that actual delivery was not intended and would not be required—a position that cannot be sustained.

If plaintiffs were seeking to avoid this contract and its effect, they might, under certain conditions and circumstances, be

heard to repudiate the representations and conduct of their agent, Brock, who acted for them in this matter. But the plaintiff here adopts the contract and is seeking recovery on it, and where this is true, he must be held bound by the acts and statements of his agent in negotiating and closing the trade. The position indicated has been often upheld in decisions of our Court and elsewhere. *Beeson v. Smith,* 149 N. C., 145; *Corbett v. Clute,* 137 N. C., 551; *Black v. Baylees,* 86 N. C., 527; *Harris v. Delamar,* 38 N. C., 219; *McIntire v. Pryor,* 173 U. S., 38; *Manufacturing Co. v. Cotton & Long,* 126 Ky., 750; *Haguerin v. Basely,* 14 Vet., 273.

In *Corbett v. Clute, supra,* plaintiff sued to foreclose a mortgage; there was allegation, with evidence, on part of defendant, tending to show that the agent of plaintiff had wrongfully procured the note and mortgage by falsely representing that the son of the mortgagor, an old, feeble, inexperienced woman, had been guilty of a criminal offense, and that unless mortgage was executed her son would be prosecuted and sent to the penitentiary. It was claimed by plaintiffs, and this was very well established, that they had not authorized the conduct of their agent; but the position was not allowed to affect the question, the Court saying: "It will not be contended that the plaintiff is not bound by the statements of his agent. He is here, now, asserting his claims under the note and mortgage obtained for him by this transaction, and if he claims the benefits, he must accept the responsibility," citing *Black v. Baylees* and *Harris v. Delamar, supra.* In *Manufacturing Co. v. Cotton & Long, supra,* it was held "that when a principal accepts an order for goods, obtained by agent, he is bound by the agent's acts in obtaining it, although he violated the principal's instructions." The principle is very generally recognized, and further citation of authority is not required.

Nor can it be contended, for a moment, that there was no testimony tending to show an understanding and agreement between defendant and plaintiff's agent, Brock, forbidden by the statute. Revisal, sec. 1689. Speaking to this question, the defendant testified as follows:

"Mr. Brock asked me if I wanted to sell some cotton for 12 cents, and I told him there was already more cotton sold around there than could be delivered, even if cotton went down below the contract price. He says, 'We are already in the hole; we have already sold some for 10 and 11.'"

Q. Who had? A. He and I, too, and several others. He says, "If you can sell this for 12 cents, you can take this and pay the difference in that 10-cent cotton."

Q. What was the agreement between you and him in reference to the actual delivery of the cotton? A. He told me it would not be expected, and we could settle on the difference.

Q. Did you intend to deliver any cotton under that contract? A. No, sir.

Q. Did you have any cotton to deliver? A. No, sir.

Q. Did you own any cotton? A. No, sir.

Q. Did Mr. Brock know that you were not farming? A. Yes, sir.

And the agent Brock testified:

You say you told Mr. May that the cotton was not expected to be delivered? A. Yes, sir; I told him I didn't think they would require the delivery of the cotton. I asked Mr. May did he want to sell some cotton for 12 cents; he said he had already sold some cotton, and as far as everything said in the conversation, I don't know about that—I can't remember that; we were talking over what they were intending to do about it—that they could take the difference in one and pay the difference in the other; and that was the way the contract was made.

Q. What was it Mr. May said to you before you signed the contract in reference to having sold some contract cotton? A. He said he had already sold some contract cotton, and in the general discussion of the contract cotton, and if he would sell more, he would take the difference in one way and pay the difference in the other; that's exactly what was said about it.

Q. What did you say to him at the time of the execution of this contract in reference to the delivery of the actual cotton? A. I told him I didn't think the actual delivery of the cotton was expected at all; if I was wrong in it, that was what I told him.

Applying the principle as stated, if, when this contract was negotiated and made, there was an understanding between defendant and plaintiff's agent that actual delivery of the cotton should not be required, but that the difference between the contract and market price could be paid in money, such a contract is condemned by the statute and no recovery can be had thereon. For the error in the charge, the defendant is entitled to a new trial, and it is so ordered.

New trial.

WALKER, J., dissenting: I regret always to differ from my brethren; but when an important and valuable right of the citizen, which, in my opinion, is recognized by the law, is abridged or impaired by a decision of this Court, it is my clear duty to enter my dissent, and, when required, as is the case here, to give my reasons therefor. I cannot agree to the proposition which seems to form the basis of the Court's opinion, that the exception in the statute, Revisal, secs. 1689, 1690, as to purchases or sales by manufacturers and wholesale merchants of the necessary commodities used in their business, is restricted to the burden of proof or to the clause of the statute raising a *prima facie* case of illegality in the transaction upon the proof of certain facts; nor do I think that it was so decided in *S. v. McGinnis,* 138 N. C., 724, or *S. v. Clayton, ibid.,* 732. An extract from the opinion of the *Chief Justice* in the former case will show the contrary: "That no other businesses or persons are mentioned as authorized to deal *bona fide* for the purchase of commodities on 'margin' is not an implied restriction upon others to do an act not forbidden by any statute. Section 7 does not confer any exclusive right or privilege upon manufacturers or wholesale merchants. It does not authorize them to engage in any business prohibited by the act of 1889. It does not authorize them to speculate in cotton or other commodities. It simply provides that the courts shall not construe the act of 1905 to have the effect of preventing them from buying and selling for future delivery the necessary commodities required in their ordinary business." It is true that the court, in that case, when considering the burden

of proof, did say: "There may be good reasons why the purchase of 'necessary commodities required in the ordinary course of their business' for future delivery 'on a margin,' by manufacturers and wholesale merchants, shall not raise a presumption that such dealings are 'wagering' contracts, while purchases by them, not of such commodities, or when not 'required in the ordinary course of their business,' or the purchase by others of any commodities, when made on the deposit of a 'margin' and for 'future' delivery, shall raise the presumption of a 'wagering' contract. Whether the reason is good and sound for making the purchase of commodities upon 'margin' *prima facie* evidence of a 'wagering' contract, under a certain state of facts, and providing that upon a different state of facts such purchase upon 'margin' does not constitute *prima facie* evidence of a 'wagering' contract, is a matter for the Legislature." But this but emphasizes the correctness of my position, that no such decision was made in that case, when we connect the two quotations and consider them together. It was evidently in the minds of the *Chief Justice* and the other members of the Court, at the time, that such manufacturers and dealers could buy cotton and other commodities *"on margin,"* if done *bona fide,* and not for the mere purpose of speculation, but for the legitimate purpose of preventing losses in their business by sudden and violent fluctuations of prices in the market. It is said in the *McGinnis case,* as we have seen, that they may purchase commodities used and required in the ordinary course of their business, "for future delivery *on a margin."*

It is thus conceded that the mere fact that such a dealer buys *"on a margin"* does not make the transaction unlawful under the statute, but is clearly authorized. The statute covers the whole subject and provides a general scheme of legislation to prevent the vicious practice of dealing, for the purpose of speculation, in "futures," which have a well-known and definite meaning, being regarded by the law as a cover for gambling, and therefore denounced by it as illegal. Such purchases and sales by manufacturers and wholesale dealers or merchants, being lawful, the Legislature, by section 1689, which declared "future contracts" unlawful, excepted such manufacturers and

dealers as we have described from the operation of that section, which means, of course, that as to them the purchase of commodities used in their business, "on margins," should be lawful, or, expressing it negatively, should not be unlawful. That exception is in section 1689 and not in the two sections 1690 and 1691, which relate to the *prima facie* case and the burden of proof.

I understood, at the time they were decided, that *McGinnis's case* and *Clayton's case* were in accord with this view, and I believe that they were intended to be; but if they are not, or were not so intended to be, I cannot longer give my assent to them.

The defendants in those two cases were indicted for conducting and maintaining bucket shops, which was plainly unlawful. They were not manufacturers or merchants, in the sense of those terms as used in the statute, and the question now presented was not necessarily involved in those decisions, although the Court, I think, recognized the law to be as I now contend it is.

Alex. Sprunt & Sons are engaged in a perfectly legitimate business, that of buying spot cotton for export, and are not dealing in what are known as "futures" for the purpose of speculation. They are wholesale dealers in the cotton itself, and buy it for resale or to fill orders, and in no view are they gambling in the article. When they buy "on a margin," it is merely for the purpose of protecting themselves against losses which may arise from the rise or fall in prices in the cotton market, and only to that extent; and this is precisely what they are authorized to do by the last provision in Revisal, sec. 1689.

But it is said that the exception to be found at the end of that section (1689) should be bodily taken therefrom and transferred to sections 1690 and 1691, which relate to the burden of proof, and the *prima facie* case made against the plaintiff by the plea of the defendant that the contract sued on is illegal, it being a gambling contract, for the purchase or sale of cotton "on margins," to be settled merely by paying the difference in the price of the commodity at a given time, which is determined by the rise or fall of the price in the market, and, therefore, purely speculative.

We are permitted to construe statutes *in pari materia* together and to transfer terms, if necessary, to ascertain the legislative intention; but we are not authorized to take an important exception from one section of the Revisal, withdrawing thereby its qualification of the broad and general provisions of the enactment, and transfer it to another section relating to a different branch of the law. It will be seen at once that this is not ascertaining, but changing, the legislative meaning; besides, the Laws of 1905, ch. 538, sec. 1, not only refers to transactions therein forbidden, such as bucket shops, but is expressly made applicable to the act of 1889, ch. 221, and to *every* section thereof, and by section 7 of the act of 1905 it is explicitly provided that it shall not apply to commodities bought and sold by wholesale dealers in their business. It was unnecessary to enact such a provision unless reference was had to purchases and sales "on margins," for those otherwise made, or in a legitimate manner, were clearly not within the prohibitory terms of the statute. The codifiers inserted the exception at the proper place, not only because the act of 1905 made it applicable to that section by plain and direct words, but also because if a purchase or sale on margins by such a dealer was not unlawful under that section, the sections as to the burden of proof and the *prima facie* case could have no bearing upon the transaction, it being a lawful one. They relate only to gambling contracts. But there is another fact to be taken into account. The Legislature, when it enacted the Revisal of 1905, placed the exception at the end of section 1689, at the very session of that body when the proviso or exception was first adopted, and the Revisal was passed in this form, with a provision repealing all public and general statutes not contained in the Revisal, with certain limitations not pertinent to this question. The Revisal took effect 1 August, 1905, and became the law of the State from that date, in form and substance as adopted. Revisal, secs. 5453, 5463. The last cited section is in these words: "All the provisions, chapters, subchapters, and sections contained in this Revisal shall be in force from and after 1 August, 1905."

It is suggested that, as section 1689 of the Revisal does not apply to the plaintiff, who is a wholesale dealer in cotton, by reason of the exception at the end of that section, the common law is in force as to him, and the burden, instead of being upon the plaintiff to show, apart from the writing, that the contract is a lawful one, where illegality of the contract is pleaded as a defense, is upon the defendant to show, as he was required to do at common law, that it was illegal. But the glaring fallacy of this position is seen in the well-recognized and established rule by which we construe all statutes. It is conceded by all writers upon the subject, and by all the judges who have considered it, to be a rule of universal application, and it is thus stated by them:

"1. The common law, of course, gives way to the statute which is inconsistent with it. 2. When a statute is designed to be a revision, consolidation, or codification of the whole body of the law, applicable to a given subject, it supersedes and supplants the common law, so far as it applies to the subject, and leaves no part of it in force." Black's Inter. of Law, p. 236; *Hannon v. Madden,* 10 Bush, 664; *Kramer v. Rebman,* 9 Iowa, 114; *Com. v. Cooley,* 10 Pick., 37; *S. v. Witson,* 43 N. H., 415.

The courts whose reports I have cited are of very high repute, and could not well go astray upon such a simple proposition. The theory and practical operation of this rule are so well explained and clearly illustrated by the Supreme Court of Alabama, in the case of *Barker v. Bell,* 46 Ala., 216, that no room is left for doubt that our statute (Revisal, sec. 1689) takes the place of the common law, and is the one and only rule upon the subject with which it deals. That Court, which is held in high esteem by all courts for its juridical learning and ability, said in the case just cited: The Revisal "is intended to contain all the statute laws of the State of a public nature, designed to operate upon all the people of the State, up to the date of its adoption, unless otherwise directed in the code. This law is not merely cumulative of the common law, and made to perfect the deficiencies of that system, but it is designed to create a new and independent system, applicable to our own institutions and government. In such case, where a statute dis-

poses of the whole subject of legislation, it is the only law. Otherwise, we shall have two systems, where one only was intended to operate, and the statute becomes the law only so far as a party may choose to follow it. Besides, the mere fact that a statute is made shows that, so far as it goes, the Legislature intended to displace the old rule by a new one. On some questions the common law conflicts more or less with our constitutional law, and is necessarily displaced and repealed by it; and in others it has, by the lapse of ages, and by mistakes inevitably attendant on all human affairs, become uncertain and difficult to reconcile with the principles of justice. Hence the Legislature intervenes to remove such difficulties, uncertainties, and mistakes, by a new law. This new law, to the extent that it goes, necessarily takes the place of all others. It would be illogical to contend that the old rule must stand, as well as the new one, because this would not remedy the evil sought to be removed and avoided."

Even if the statute introduces a new rule, it repeals immemorial custom · and the common law, provided the enactment introduces a new principle or rule sufficient in itself. Black, p. 236; *Delaplane v. Crenshaw,* 15 Grattan, 457. So we see it is not necessary that a statute should be in direct conflict with the common law in order to repeal it, but it is quite sufficient if the statute introduces into the law a new principle and a new rule sufficient of itself to create or answer for a full provision upon the subject. The Revisal, sec. 1689, is of this character, and it takes the place of the common law as much so as if there had been an express clause of repeal of that law in it. The exception, therefore, applies to the law as declared in that section, and there is no common law upon the subject left to operate, it having been repealed, and the statute furnishes the only rule.

After careful deliberation, my conclusion is that the charge of the court was correct, regardless of what occurred between the defendant, C. C. May, and the plaintiff's agent, F. Brock. His Honor appears to have entertained the same views as those herein expressed, and for that reason instructed the jury as he did.

I concur with the majority of the Court in the construction placed upon section 1689 of the Revisal, so far as it relates to the real agreement of the parties. If it is agreed or understood by both parties that there need not be an actual delivery of the cotton, but that the contract may be settled by either one of them by paying the difference in the price, and the transaction is not within the exception, it is void by the terms of the statute; but the undisclosed or unexpressed intention of one of the parties is not sufficient to invalidate it, as a contract is the agreement of both parties, and not merely the intention of one. "A contract, express or implied, executed or executory, results from the concurrence of minds of two or more persons, and its legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it. It is not what either thinks, but what both agree." *Prince v. McRae,* 84 N. C., 675. See, also, *Brunhild v. Freeman,* 77 N. C., 128; *Pendleton v. Jones,* 82 N. C., 249; *Bailey v. Rutjes,* 86 N. C., 517. Besides, Revisal, sec. 1689, declares that the contract shall be void, notwithstanding the terms stated therein, if it was not intended, *by the parties thereto,* that the articles or thing so in form agreed to be sold and delivered should be actually delivered or the value thereof paid, but that it should be settled by paying the differences in the market price, according as the same may be greater or less at the time and place fixed for the performance of the contract. It will be seen that it is the unlawful intention in the understanding of *both* parties, and not merely the secret purpose of one of them, that renders the contract invalid.